# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**DISTRICT OF COLUMBIA**,
    400 6th Street NW
    Washington, DC 20001,

        *Plaintiff*,

    v.

**DONALD J. TRUMP**, *in his official capacity as President of the United States*;
    1600 Pennsylvania Avenue NW
    Washington, DC 20500

**PAMELA J. BONDI**, *in her official capacity as United States Attorney General*;
    950 Pennsylvania Avenue NW
    Washington, DC 20530

**UNITED STATES DEPARTMENT OF JUSTICE**;
    950 Pennsylvania Avenue NW
    Washington, DC 20530

**TERRANCE C. COLE**, *in his official capacity as Administrator of the United States Drug Enforcement Administration*;
    8701 Morrissette Drive
    Springfield, VA 22152

**UNITED STATES DRUG ENFORCEMENT ADMINISTRATION**;
    8701 Morrissette Drive
    Springfield, VA 22152

**GADYACES S. SERRALTA**, *in his official capacity as Director of the United States Marshals Service*;
    1215 South Clark Street
    Arlington, VA 22202

**UNITED STATES MARSHALS SERVICE**;
    1215 South Clark Street
    Arlington, VA 22202

        *Defendants*.

Case No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.     More than 50 years ago, Congress empowered the people of the District of Columbia to govern themselves through the District of Columbia Home Rule Act ("Home Rule Act"), Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified as amended at D.C. Code §§ 1-201.01, *et seq.*). Invoking its constitutional authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the] District," U.S. Const. art. I, § 8, cl. 17, Congress gave the inhabitants of the District of Columbia many of the "powers of local self-government" that other Americans enjoy: to elect a Mayor and a City Council, to adopt local laws, and to operate the institutions of local government—including local law enforcement—largely as they see fit. Home Rule Act, § 201. Congress reserved for itself the authority to review the District's laws and legislate on matters of federal concern. But it otherwise left the operation of the local government in local hands.

2.     By contrast, Congress gave the President an exceedingly narrow role in the governance of the District. In Section 740 of the Home Rule Act, Congress provided that if the President "determines that special conditions of an emergency nature exist," the President may require that the Mayor "provide such services" of the Metropolitan Police Department ("MPD") as the President deems necessary for "federal purposes." D.C. Code § 1-207.40(a).

3.     In the 52 years since the enactment of Home Rule, no President has ever attempted to exercise this limited authority.

4.     The President's authority under Section 740 is sharply limited in time:  it must terminate within 48 hours unless the President sends proper notice to Congress, and, in all events, it must terminate upon the expiration of the emergency or within 30 days, whichever comes first. *Id.* § 1-207.40(a)-(b). For the President to obtain MPD's services for longer than 30 days—even

in the face of an ongoing emergency—Congress must pass a joint resolution permitting the extension. *Id.* § 1-207.40(d).

5.     Moreover, by its terms, Section 740 only permits the President to require the Mayor to "provide services" of MPD for "federal purposes." *Id.* § 1-207.40(a). It does not permit the President to seize control of MPD. Nor does it authorize the President to direct MPD in the policing of local crime. Congress left that responsibility to local leaders. *Id.*

6.     In violation of the plain language of Section 740, the President announced on August 11, 2025, that he was "placing the D.C. Metropolitan Police Department under direct federal control," and that Attorney General Pamela J. Bondi was "taking command" of MPD "as of this moment." He also stated that he was appointing Terrance Cole, the Administrator of the Drug Enforcement Administration ("DEA"), as the "interim commissioner" of the MPD. Attorney General Bondi later added that Gady Serralta, the Director of the United States Marshals Service ("USMS"), would be "supervising command and control" of "the entire operation" of MPD.

7.     That same day, the President issued an Executive Order that invoked his authority under Section 740 of the Home Rule Act. *See* "Declaring a Crime Emergency in the District of Columbia," Exec. Order No. 14,333 (Aug. 11, 2025) ("EO"). The President did not identify any new or unusual exigency that justified the invocation of Section 740. Instead, he claimed that violent crime in the District is "increasing," *id.* § 1, when, in fact, it has fallen 26% since 2024. The President also did not limit the scope of his order to specific "federal purposes," instead directing the Mayor to provide any services the Attorney General deemed necessary to "maintain[] law and order in the Nation's seat of Government." *Id.* §§ 2-3. And in neither the EO nor his notice letter to Congress did the President state the period of time during which the need for MPD services was likely to continue.

8.      For four days, the Administration asserted in public statements and social media posts that it had taken direct operational control of MPD, while District Mayor Muriel Bowser and MPD Chief of Police Pamela Smith stated that they were still in charge of MPD.

9.      Then, on the evening of August 14, 2025, without any advance warning to MPD, Defendant Bondi issued Order No. 6370-2025, "Restoring Safety and Security to the District of Columbia" ("Bondi Order").[1] The Bondi Order purports to "order the Mayor of the District of Columbia and the [MPD] to immediately implement" multiple directives.

10.     Defendant Bondi ordered that, "effective immediately," Defendant Cole "shall serve as MPD's Emergency Police Commissioner for the duration of the emergency declared by the President." She further ordered that "Commissioner Cole shall assume all of the powers and duties vested in the District of Columbia Chief of Police." And she stated that "the current Chief of Police" and all other senior leadership at MPD "must receive approval from Commissioner Cole before issuing any further directives to the MPD."

11.     The Bondi Order further purports to rescind or suspend provisions of three MPD orders issued by the Chief of Police that address MPD officers' involvement in immigration enforcement. It also directs MPD to enforce "to the maximum extent permissible by law" certain municipal laws and regulations pertaining to unlawful occupancy of public spaces.

12.     Finally, the Bondi Order generally "rescind[s]" any existing MPD directives that conflict with any of its provisions.

13.     In every respect, the Bondi Order and Defendants' assertions of authority over MPD exceed the narrow delegation that Congress granted the President in Section 740.

---

[1] https://x.com/ChadGilmartinCA/status/1956162781679640832.

14.     First, the Bondi Order purports to effect a complete takeover of MPD by the federal government. It installs a handpicked federal official as chief of police, grants him sweeping power to issue commands directly to MPD, and bars MPD senior leadership from acting without his approval. It also purports to suspend MPD policies that Defendant Bondi dislikes, impose enforcement policies she favors, and rescind any existing orders that stand in the way. In short, it attempts to divest the District and its residents of any control of their local police force and place it, for all purposes, under the control of the federal government.

15.     Section 740 does not authorize this brazen usurpation of the District's authority over its own government. That narrow statute permits the President and his delegee to request that the Mayor provide the "services" of MPD—nothing more. None of the directives in the Bondi Order fall within the compass of that limited grant of authority.

16.     Second, Defendants have unlawfully made demands of MPD that far exceed the constraints of Section 740, which only permits the President to request "*services*" for a "*federal purpose*." The Bondi Order directly interferes with and directs policies and enforcement related to purely local matters. The Order displaces the local Chief of Police, necessarily impacting MPD's purely local, municipal policing functions. The Order directs enforcement of a local statute governing public disturbances on local lands. The EO additionally directs MPD to provide services to engage in purely local law enforcement activities, including "maintaining law and order" throughout the District. EO § 2. The entire structure of the statute reflects Congress's judgment that control over local affairs should be left to the people of the District—not seized by the President based on his disagreements with local law enforcement policy.

17.     Third, in invoking his authority under Section 740, the President has not articulated the nature of the "special" and "emergency" conditions with the specificity needed to determine

when the purported emergency will end, as required by the Home Rule Act. On the contrary, his assertion that crime in general—and declining crime at that—represents the sort of "special" and "emergency" conditions that can trigger his authority under Section 740 sweeps so broadly that it would undermine Congress's decision to transfer control for day-to-day governance of the city to locally elected and accountable leaders.

18.    These unlawful assertions of authority will create immediate, devastating, and irreparable harms for the District. Most critically, the order threatens to upend the command structure of MPD and wreak operational havoc within the department, endangering the safety of the public and law enforcement officers alike. There is no greater risk to public safety in a large, professional law enforcement organization like MPD than to not know who is in command.

19.    To redress these unlawful assertions of authority, the District seeks a preliminary and permanent injunction, declaratory relief, vacatur, and all other appropriate relief to ensure that control of MPD remains with the people of the District of Columbia and that the Home Rule Act is followed as Congress directed.

### JURISDICTION AND VENUE

20.    The Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

21.    The Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 704-706.

22.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The District and multiple Defendants are either residents of or have a place of business in this judicial

district, and all of the decision-making and events giving rise to this Complaint occurred within the District of Columbia.

## PARTIES

23.    The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District, all suits initiated by and against the District, and is responsible for upholding the public interest.

24.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

25.    Defendant Pamela J. Bondi is the Attorney General of the United States. She is sued in her official capacity. Attorney General Bondi is responsible for all aspects of the operation and management of the United States Department of Justice, including implementing and fulfilling DOJ's duties under the United States Constitution and statutory law.

26.    Defendant United States of Department of Justice is a cabinet agency within the executive branch of the United States government. 28 U.S.C. § 501. The Justice Department is an agency under the Administrative Procedure Act ("APA"). 5 U.S.C. § 551(1); *see also* 5 U.S.C. § 701.

27.    Defendant Terrance C. Cole is the Administrator of the DEA. He is sued in his official capacity.

28.    Defendant United States Drug Enforcement Agency is a federal law enforcement agency within the Justice Department, primarily charged with enforcement of the Controlled

Substances Act. Reorg. Plan No. 2 of 1973 § 4. The United States Drug Enforcement Agency is an agency under the APA. 5 U.S.C. § 551(1); *see also* 5 U.S.C. § 701.

29.    Defendant Gadyaces S. Serralta is the Director of the United States Marshals Service. He is sued in his official capacity.

30.    Defendant United States Marshals Service is a federal law enforcement agency within DOJ responsible for enforcing federal laws and providing support for the federal justice system. The United States Marshals Service is an agency under the APA. 5 U.S.C. § 551(1); *see also* 5 U.S.C. § 701.

31.    Defendants Bondi, DOJ, Cole, DEA, Serralta, and USMS are referred to herein as the "Agency Defendants."

## FACTUAL ALLEGATIONS

### I.    The Home Rule Act Empowers the District to Control Local Law Enforcement.

#### A.    *Enactment of the Home Rule Act Followed Nearly a Century of Struggle.*

32.    The U.S. Constitution grants to Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. art. I, § 8, cl. 17.

33.    Congress's implementation of that authority has evolved. For much of the 1800s, Congress approved and provided for a locally elected council. Chris Myers Asch & George Derek Musgrove, *Chocolate City: A History of Race and Democracy in the Nation's Capital* 36-37 (2017); *see* Act of 1812 Amending the Charter of Washington, ch. 75, 2 Stat. 721 (May 4, 1812).

34.    Beginning in 1871, however, the District was governed, at first in part and then in total, by presidentially appointed officials. This left the District's citizens with no say in local policies or governance. *See* Act to Provide a Government for the District of Columbia, ch. 62, 16

8

Stat. 419 (Feb. 21, 1871); Asch & Musgrove 160, 165; Temporary Organic Act of 1874, ch. 337, 18 Stat. 116 (June 20, 1874).

35.     Throughout the 20th century, politicians and policymakers increasingly recognized that District residents were being deprived of basic civil rights. In 1948, President Truman's 10-point civil rights proposal to Congress included a call for "home-rule and suffrage in Presidential elections for the residents of the District of Columbia." President Harry S. Truman, Special Message to the Congress on Civil Rights (Feb. 2, 1948), https://tinyurl.com/4yv2s8tm.

36.     In his 1955 State of the Union speech, President Eisenhower "renew[ed] his request that the principle of self-government be extended and the right of suffrage granted to the citizens of the District of Columbia." Annual Message to the Congress on the State of the Union (Jan. 6, 1955).[2]

37.     Civil rights leaders, including Martin Luther King Jr., also drove the fight for home rule. Asch & Musgrove 345-46. In the 1960s, President Johnson advocated for District voting rights as a part of his broader civil rights agenda. Harry S. Jaffe & Tom Sherwood, *Dream City: Race, Power, and the Decline of Washington, D.C.* 44 (1994).

38.     Home rule, according to President Johnson, was "the truest course," and he urged that the District's citizens have "the right to frame their own laws, manage their own affairs, and choose their own leaders." Special Message to the Congress Transmitting Reorganization Plan 3 of 1967: Government of the District of Columbia (June 1, 1967).[3]

---

[2] https://www.presidency.ucsb.edu/documents/annual-message-the-congress-the-state-the-union-12.

[3] https://www.presidency.ucsb.edu/documents/special-message-the-congress-transmitting-reorganization-plan-3-1967-government-the.

### B. *The Home Rule Act Grants the District Autonomy Over Its Own Affairs, Including Control of MPD.*

39.     After a century of struggle, and amid increasing recognition of District residents' right to local autonomy, Congress finally passed the Home Rule Act in 1973. *See* Home Rule Act, D.C. Code §§ 1-201.01 to 1-207.71.

40.     Through the Home Rule Act, Congress "grant[ed] to the inhabitants of the District of Columbia powers of local self-government." D.C. Code § 1-201.02(a). Quoting President Nixon, the drafters described the "spirit of home rule," stating that a "pressing goal[] for this Nation is to place local functions under local control, and to equip local governments with the authority and the resources they need in order to serve their communities well." S. Rep. No. 219, S. 1435, 93d Cong., 1st Sess. 2 (1973) (quoting President Nixon, 1971 message to Congress).

41.     The Home Rule Act created an elected legislative body, the Council of the District of Columbia, and granted it "legislative power," subject to limited restrictions. D.C. Code § 1-206.02. The Council's powers and duties are comparable to those held by state legislatures, including the authority to adopt laws; to approve the annual budget; and to create, abolish, and define the powers and responsibilities of District agencies and instrumentalities, *id.* § 1-204.04(b).

42.     The Home Rule Act "vest[s]" the "executive power of the District" in an elected Mayor, who serves as the "chief executive officer of the District government." D.C. Code § 1-204.22. The Act makes the Mayor responsible for, among other things, overseeing the District's local police force, MPD. *Id.* § 1-204.22(4); *see also id.* § 5-105.01(a).

43.     Under District law, the Mayor appoints the Chief of Police, who in turn supervises MPD officers. *See* D.C. Code §§ 5-105.01(a-1), 5-127.03. The Chief is "subject to any orders, rules, and regulations as may from time to time be issued by the Mayor or Council of the District of Columbia," and is "responsible for the proper and efficient conduct, control, and discipline of

the force." 6-A DCMR § 800.1. Individual officers, in turn, must obey lawful orders they receive from superior officers and must abide by MPD rules and policies. *See* D.C. Code § 5-127.03; 6-A DCMR §§ 200.5, 200.22.

44.     Under the Home Rule Act, Congress "retain[s]" "ultimate legislative authority" over the District, including the right to review legislation enacted by the Council. D.C. Code § 1-201.02(a); *see also id.* §§ 1-206.01 to 1-206.04. But unless Congress intervenes, the Act provides that control over local matters remains in the hands of the District of Columbia's locally elected leaders.

### C.   *Section 740 of the Home Rule Act Grants the President a Time-Limited Authority to Require the Mayor to Provide MPD Assistance in Emergency Circumstances for Federal Purposes.*

45.     In contrast to the system of presidential control that preceded home rule—and which Congress sought to abolish—the Home Rule Act grants the President virtually no role in the governance of the District of Columbia.

46.     One exceedingly narrow exception is Section 740 of the Home Rule Act, which grants the President a time-limited authority to require the Mayor to provide assistance from MPD in certain emergency circumstances. It states:

> Notwithstanding any other provision of law, whenever the President of the United States determines that special conditions of an emergency nature exist which require the use of the Metropolitan Police force for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate.

D.C. Code. § 1-207.40(a).

47.     By its text, this provision may be invoked only in extraordinary circumstances: where "the President of the United States determines that special conditions of an emergency

11

nature exist." *Id.* Furthermore, it grants the President a narrowly circumscribed authority once he makes the requisite determination. He may only "direct the Mayor to provide him . . . services of the Metropolitan Police force," not seize command and control over the police force himself. *Id.* And he may request such services only "for federal purposes," not for local matters that the Home Rule Act expressly reserves to the people of the District and their locally elected officials. *Id.*

48.     The authority granted by Section 740 is also time-limited. Services provided under Section 740 cannot be made available for more than 48 hours unless the President has, within that timeframe, "notified the Chairmen and ranking minority members of the Committees on the District of Columbia of the Senate and House of Representatives, in writing," about the reason for the services requested and "the period of time during which the need for such services is likely to continue." *Id.*

49.     Moreover, the services provided under Section 740 must terminate after 30 days, when the emergency ends, or when Congress enacts a joint resolution providing for termination— whichever occurs first. *Id*. § 1-207.40(b)-(c). In all events, "no such services made available pursuant to the direction of the President pursuant to [Section 740] shall extend for any period in excess of 30 days," unless Congress enacts a joint resolution approving of such an extension. *Id.* § 1-207.40(d).

## II.    Defendants Have Asserted Unlawful Authority Over MPD After Years of Threats.

### A. *The President Has Repeatedly Threatened to Infringe on District Home Rule.*

50.     Despite decades of local governance in the District, President Trump has long threatened to infringe on home rule, claiming that crime in the city is out of control and disparaging its aesthetics.

51.     On the campaign trail, President Trump repeatedly promised to limit District home rule. In March 2023, at the Conservative Political Action Conference, then-candidate Trump remarked that he had seen roads "littered with trash" while driving through the District. He claimed that, during his first term as President, he had "people out there all the time sweeping highways, cleaning highways, hosing them down." He then declared, "[f]rankly the federal government should take over control and management of Washington, D.C."[4]

52.     Similarly, in August 2023, then-candidate Trump remarked on social media that he was "calling for a federal takeover of this filthy and crime ridden embarrassment to our nation."[5]

53.     In a November 2023 campaign speech, he promised that the District would "become the most beautiful capital anywhere in the world. We're going to take over the capital and we're going to make it beautiful, we are going to make it safe, we're going to make it great."[6]

54.     In January 2024, Trump reiterated, "We're . . . going to federalize Washington D.C. It's become hell on earth. . . . . [Y]ou can't even walk through the best areas without being molested or shot, beat up by thugs. We're going to take over Washington D.C., and we're going to make it great again."[7]

---

[4] https://x.com/atrupar/status/1632168980130455553?lang=ms.
[5] https://www.cnn.com/2023/08/06/politics/trump-fair-trial-court-case-dc-venue-change/index.html.
[6] https://www.the-independent.com/tv/news/trump-iowa-speech-washington-election-b2450354.html.
[7] https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-mason-city-iowa-january-5-2024/#218:~:text=And%20we%27re%20also%20going%20to,control.%20It%27s%20out%20of%20control.

55.     Similarly, in July 2024, after making assertions about crime in the District, Trump declared, "We're going to take it away from the mayor. [T]hat doesn't make me popular there, but I have to say it."[8]

56.     President Trump's attacks on the District's independence and local autonomy under the Home Rule Act have continued since he re-entered office. On February 19, 2025, President Trump told reporters, "I think that we should govern the District of Columbia . . . I think that we should run it strong, run it with law and order, make it absolutely flawless . . . And I think we should take over Washington, D.C. . . . . We should govern D.C. The federal government should take over the governance of D.C. . . . [T]hey're not doing the job—too much crime, too much graffiti, too many tents on the lawn."[9]

57.     On March 14, 2025, in remarks at DOJ headquarters, President Trump declared, "[w]e're cleaning up our city. We're cleaning up this great capital, and we're not going to have crime and we're not going to stand for crime, and we're going to take the graffiti down and we've already taken the tents down there." He continued, "[w]e're working with the administration, and if the administration can't do the job . . . we're gonna have to take it back and run it through the federal government." He added, however, that the District's local leaders had "been doing very well. The mayor has been doing a good job."[10]

58.     In early August, President Trump's threats accelerated following a highly publicized incident involving a former staff member of the Department of Government Efficiency ("DOGE"). Around 3 a.m. on August 3, the former DOGE staffer was reportedly assaulted by a

---

[8] https://www.nbcwashington.com/news/local/heres-what-a-second-trump-presidency-could-mean-for-dc/3762595/.
[9] https://x.com/JakeSherman/status/1892407773603778589/photo/1.
[10] https://www.cbs42.com/hill-politics/trump-suggests-federal-government-take-over-dc-if-local-leaders-cant-do-the-job/.

group of teenagers in an attempted carjacking. MPD quickly responded to the incident and apprehended two suspects.

59.     Two days later, President Trump posted to his social media platform, Truth Social, a photo of a young man—identified by others as the former DOGE staffer—bloodied and with wounds to his face. In this post, the President claimed that "[c]rime in Washington, D.C., is totally out of control," and he renewed threats to "federalize" the District in light of the attack.[11]

60.     In the subsequent days, President Trump continued to threaten to take control of the District—including MPD—with the stated intention of addressing crime:

- On August 5, 2025, the President told reporters, "[s]omebody from DOGE was very badly hurt last night. You saw that. A young man that was beat up by a bunch of thugs in D.C. And either they're going to have to straighten out their act in the terms of government and in the terms of protection or we're going to have to federalize it, run it the way it's supposed to be run."[12]

- On August 6, 2025, President Trump reiterated his threat to take control of MPD: "We're considering [taking federal control over MPD] because the crime is ridiculous . . . Now we want to have a great, safe capital, and we're gonna have it, and that includes cleanliness and it includes other things. . . . We're going to do something about it, so whether you call it federalize or what—and that also includes the graffiti that you see, the papers all over the place, the roads that are in bad shape, the medians that are falling down . . . And what a shame—

---

[11] https://truthsocial.com/@realDonaldTrump/posts/114977985620971126.
[12] https://www.youtube.com/watch?v=Fb7yKvOQE_c.

the rate of crimes, the rate of muggings, killings, and everything else. And that
includes bringing in the National Guard, maybe, very quickly."[13]

- On August 9, 2025, the President announced that he would soon hold a press
conference that "will, essentially, stop violent crime in Washington, D.C.,"
calling the District "one of the most dangerous cities anywhere in the World. It
will soon be one of the safest!!!"[14]

61.     On August 10, 2025, the eve of his scheduled press conference, President Trump
once again took to Truth Social to talk about crime in the District: "The Mayor of D.C., Muriel
Bowser, is a good person who has tried, but she has been given many chances, and the Crime
Numbers get worse and the City only gets dirtier and less attractive. The American Public is not
going to put up with it any longer. Just like I took care of the Border, where you had ZERO
illegals coming across last month, from millions the year before, I will take care of our cherished
Capital, and we will make it, truly, GREAT AGAIN!" (capitalization in original).[15]

62.     The President's statements about rising crime in the District are hyperbolic and
inconsistent with the facts. Publicly available data from both federal and local sources demonstrate
that violent crime in the District is trending significantly downward.

63.     According to the U.S. Department of Justice, "[t]otal violent crime for 2024 in the
District of Columbia [was] down 35% from 2023 and [was] the lowest it [had] been in over 30
years."[16]

---

[13] https://www.facebook.com/watch/?v=787799723585929.
[14] https://truthsocial.com/@realDonaldTrump/posts/114999087271735961.
[15] https://truthsocial.com/@realDonaldTrump/posts/115005692562794802.
[16] https://www.justice.gov/usao-dc/pr/violent-crime-dc-hits-30-year-low.

64.    That downward trend has continued. In 2025, violent crime is down 26% from this time in 2024, 51% from this time in 2023, and 35% from 2019, prior to the pandemic.

65.    Both President Trump and the U.S. Attorney's Office for the District of Columbia have acknowledged the decline in violent crime in D.C. in 2025.

66.    In an April 28, 2025 press release, former interim U.S. Attorney Ed Martin, Jr. marked the first 100 days of President Trump's second term "by highlighting a 25 percent drop year-to-date in violent crime across the District, credited in part to the 'Make D.C. Safe Again' initiative and the U.S. Attorney's partnership with the Bureau of Alcohol, Tobacco, Firearms, and Explosives and [the] Metropolitan Police Department."[17]

67.    Shortly thereafter, on May 7, 2025, President Trump praised Mr. Martin, stating that on his watch, "[c]rime is down in Washington, D.C.—street crime, violent crime—by 25%. And it's . . . people have seen . . . they've noticed a big difference."[18]

### B. President Trump Invokes Section 740 of the Home Rule Act.

*The Press Conference*

68.    On August 11, 2025, flanked by Defendant Bondi, Defense Secretary Pete Hegseth, FBI Director Kash Patel, U.S. Attorney for the District of Columbia Jeanine Pirro, and other officials, the President carried through on the threats he had been making for more than two years. In a press conference in the White House briefing room, he "announc[ed] a historic action to rescue our nation's capital from crime, bloodshed, bedlam, and squalor, and worse." He continued, "[t]his is liberation day in DC and we're gonna take our capital back. We're taking it back."

---

[17] https://www.justice.gov/usao-dc/pr/us-attorney-ed-martin-jr-credits-president-trumps-first-100-days-25-drop-dc-violent.

[18] https://www.youtube.com/watch?v=MydfT0rCkZ8&ab_channel=TheWhiteHouse.

69.     In addition to deploying the D.C. National Guard and threatening an influx of additional active military personnel, the President asserted he was invoking Section 740 and "placing the Metropolitan Police Department under direct federal control" because he asserted that the District "has been overtaken by violent gangs and bloodthirsty criminals, roving mobs of wild youth, drugged out maniacs and homeless people."

70.     The President announced that "Attorney General Pam Bondi . . . is taking command of the Metropolitan Police Department as of this moment" and that Defendant Cole would be "designated as the interim federal commissioner" of MPD.

71.     Later, in her own remarks, Defendant Bondi announced that Defendant Cole "is going to be supervising the Metro Police Department" and that Defendant Serralta "is going to be supervising command and control, the entire operation."

*The Executive Order*

72.     Also on August 11, 2025, the President signed an EO entitled "Declaring a Crime Emergency in the District of Columbia."

73.     The EO repeats some of the same unfounded claims about rising crime in the District and effectuates the President's assertion of authority under Section 740.

74.     Section One, captioned "Crime is out of control in the District of Columbia," asserts that there is a problem of "rising violence" and "increasing violent crime" in the Capital. The sole data the order cites for those assertions are statistics from 2024. As noted above, in 2024, violent crime fell 35% from the prior year. And it has since fallen by an additional 26%. The claim of increasing violence based on 2024 statistics is also contradicted by the President's and DOJ's own statements in 2025 that violent crime in the District has decreased.

75.     Section Two of the EO, entitled "Services of the Metropolitan Police Department of the District of Columbia," states that the President has "determined that special conditions of an emergency nature exist that require the use of the Metropolitan Police Department of the District of Columbia (Metropolitan Police force) for Federal purposes." It then included a list of purported "federal purposes," one of which is "maintaining law and order in the Nation's seat of Government." It further states that, "[e]ffective immediately, the Mayor of the District of Columbia (Mayor) shall provide the services of the Metropolitan Police force for Federal purposes for the maximum period permitted under section 740 of the Home Rule Act."

76.     Section Three, "Operational Control of the Metropolitan Police Department of the District of Columbia," delegates "[t]he authority of the President conferred by section 740(a) of the Home Rule Act" to the Attorney General. And it directs the Mayor to "provide such services of the Metropolitan Police force as the Attorney General may deem necessary and appropriate."

77.     Section Four, "Monitoring and Recommendations," requires the Attorney General to monitor conditions in the District and advise the President on whether further actions are necessary.

78.     On August 11, the President sent letters to the Chair and Ranking Member of the House Committee on Oversight and Government Accountability and the Senate Committee on Homeland Security and Governmental Affairs notifying them that he had invoked Section 740 and stating that "the Mayor will provide to me the services of [MPD] for Federal purposes until I have determined, in consultation with the Attorney General, that the emergency has ended or for the maximum period permitted under section 740."[19] This notice did not identify "the period of time

---

[19] https://www.nytimes.com/interactive/2025/08/11/us/trump-letter-dc-police-letter.html.

during which the need for such services is likely to continue," as Section 740 of the Home Rule Act requires.

### C. Defendants Continue Asserting They Have Unlawful Control Over MPD.

79.     In the hours following the release of the EO, the White House released multiple public statements reiterating the President's assertions that he had completely taken over control of MPD to conduct general, local law enforcement operations in DC, rather than asking the Mayor to provide MPD services for a "federal purpose."

80.     A "Fact Sheet" posted to the White House website stated that President Trump promised he would "take over the horribly run capital city of our nation, Washington, D.C., and clean it up, renovate it, and rebuild our capital city so that it is no longer a nightmare of murder and crime."[20]

81.     A White House "Article" claiming that President Trump was "liberating" the District from a "cesspool of crime" repeated the assertion that Defendant Bondi was "taking command" of MPD.[21]

82.     In both the letter transmitted to Congress and the White House "Fact Sheet," President Trump explicitly stated that "maintain[ing] law and order" in the District is one of the "federal purposes" for which he has invoked Section 740. At an August 12, 2025 White House press briefing, a reporter, noting the Mayor and Police Chief's statements that they remained in control of MPD, asked Press Secretary Karoline Leavitt who was in charge of MPD at the moment. Leavitt responded, "[i]f you read the Executive Order, it will tell you . . . but ultimately, the chain of command is as such: the President of the United States, the Attorney General of the United

---

[20] https://www.whitehouse.gov/fact-sheets/2025/08/fact-sheet-president-donald-j-trump-declares-a-crime-emergency-to-restore-safety-in-the-district-of-columbia/.
[21] https://www.whitehouse.gov/articles/2025/08/its-liberation-day-in-washington-d-c/.

States, our DEA Administrator, Terry Cole, who is now serving ahead of the chief of [MPD]." When a reporter started to challenge Leavitt's statement, she reiterated: "Nope, Terry Cole, as you heard from this briefing room yesterday, is in charge of the Metropolitan Police Department."[22]

83.     On August 13, 2025, the President expressed his intention to retain control over MPD indefinitely. When asked in a press briefing whether he would be seeking congressional support for a resolution extending the Section 740 invocation beyond its 30-day limit, he stated, "[w]ell if it's a national emergency, we can do it without Congress. But we expect to be before Congress, very quickly . . . . We're going to be asking for extensions on that—long term extensions—because you can't have 30-days . . . . We're going to want extensions. I don't want to have to call a national emergency, but if I have to, I will."

84.     Section 740 expressly limits the President's use of MPD services until the conclusion of the emergency circumstances or the expiration of 30 days—*whichever occurs first*— unless Congress intervenes. There is no exception for "a national emergency."

### D.  The Mayor Maintains Command of MPD Through the Evening of August 14.

85.     Despite Defendants' unlawful assertions of control over MPD in the initial days after the EO was issued, the Mayor and Chief of Police repeatedly stated publicly that they remained in operational control of MPD pursuant to the Home Rule Act. [23]

86.     Following the President's press conference and issuance of the EO on August 11, 2025, Mayor Bowser held a press conference of her own, where she correctly explained that, under the Home Rule Act, she remained in command of the MPD, together with the Chief of Police.

---

[22] https://www.youtube.com/watch?v=KBQJjxKbEMA&t=2233s&ab_channel=TheWhiteHouse.
[23] https://www.youtube.com/watch?v=71ES6EBMfNA.

87.     On August 12, 2025, District officials met with Defendant Bondi, Defendant Cole, and other federal officials to discuss the Executive Order. Following the meeting, Defendant Bondi posted on social media that she had a "productive meeting" with the Mayor and that, "[a]t President Trump's direction, [DOJ] will work closely with D.C. city government and [MPD] to make Washington, D.C. safe again."

88.     Mayor Bowser and Chief Smith agreed it was a cooperative meeting and stated that MPD's "organizational chart, how [it does] business and fund[s] the police and make[s] changes, none of that has changed." And when directly asked, Chief Smith stated that she reported to Mayor Bowser.

89.     After that meeting, however, the Agency Defendants took increasingly drastic steps to implement the EO and exert greater control over MPD. For example, Defendants obtained an MPD badge for Defendant Cole with the title "Terrence [*sic*] C. Cole, Interim Commissioner (DEA) Armed," which bears an expiration date of August 13, 2026—far past the 30-day limit proscribed in the Home Rule Act.



### E.  Defendant Bondi Issues an Order Attempting to Take Full Control of MPD Operations.

90.    On the evening of August 14, 2025, following days of tension around the operational control of MPD and without any warning to MPD, Defendant Bondi issued an order, "[e]ffective immediately," that purports to name Defendant Cole as MPD's "Emergency Police Commissioner." The Bondi Order also claims to grant Defendant Cole "all of the powers and duties vested in the District of Columbia Chief of Police," and the "authority to issue any general orders, executive orders, or other written directives that apply to Members of the MPD."

91.    The Bondi Order further attempts to direct MPD leadership, including the Chief of Police, to "receive approval from Commissioner Cole before issuing any further directives to MPD."

92.    The Bondi Order's attempt to upend MPD's command structure by unilaterally imposing new leadership and requiring MPD leadership to answer to Defendant Cole directly

contravenes MPD officers' duty under District law to obey the orders of the Chief of Police. *See* D.C. Code § 5-127.03.

93.    In addition, the Bondi Order claims to:

- Rescind Executive Order EO-25-005, issued by Chief Smith on August 14, 2025, which amended MPD procedures regarding cooperation with federal immigration enforcement agencies;

- Suspend Section IV, paragraph 22 of General Order GO-PER-201.26, issued by Chief Smith on June 12, 2024, which establishes the responsibilities and standards of conduct for all sworn and civilian members of MPD pertaining to immigration enforcement; and

- Suspend Section II, paragraphs A.2 and F of General Order GO-PCA-702.01, issued on October 18, 2023, which also relate to immigration enforcement and, among other things, implement the District-wide policy on immigration enforcement established in Mayor's Order 2011-174.

94.    The Bondi Order also purports to direct MPD to enforce, to the maximum extent permissible by law, local statutes and municipal regulations pertaining to the unlawful occupancy of public spaces and demonstrations.

95.    Further, the Bondi Order directs all MPD leadership to receive approval solely from Defendant Cole before issuing directives to other MPD personnel and claims to rescind all MPD directives that conflict with its provisions.

96.    Implementation of the Bondi Order would irreparably harm the District of Columbia. It would upend the entire command structure of MPD and sow chaos among the more

than 3,100 officers serving the District, endangering the safety of the public and law enforcement officers alike.

97.    Imposing a new command structure "effective immediately" will wreak operational havoc within MPD. The new command structure will create confusion for MPD personnel, who are required under District law to respect and obey the Chief of Police as the head and chief of the police force. D.C. Code § 5-127.03. This will also inevitably lead to delays and confusion as MPD personnel—including its experienced leadership—are forced to run their directives by an "Emergency Commissioner" who is unfamiliar with MPD procedures and the local communities MPD serves. There is no greater risk to public safety in a large, professional police force like MPD than to not know who is in command.

98.    Implementation of the Bondi Order would also irreparably harm the District by invading the sovereignty and "powers of local self-government" that Congress gave to the District in the Home Rule Act.

## CAUSES OF ACTION

### COUNT ONE
### Administrative Procedure Act
### Action in Excess of Statutory Authority and Contrary to Law
### (Agency Defendants)

99.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

100.    Under the Administrative Procedure Act ("APA"), a court shall "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

101.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

102.    The Agency Defendants have taken final agency actions by issuing the Bondi Order.

103.    The Bondi Order is reviewable as final agency action under the APA. 5 U.S.C. § 704. The Bondi Order represents the consummation of Defendant Bondi's decision-making process: it is a formal order on DOJ letterhead and signed and dated by Defendant Bondi. No additional action from DOJ is needed to effectuate it.

104.    The Bondi Order also establishes rights and obligations of multiple parties and carries significant legal consequences.

105.    First, it purports to confer on Defendant Cole the right to exercise "all powers and duties vested in the District of Columbia Chief of Police," as well as the right to "issue any general orders, executive orders, or other written directives that apply to members of the MPD." The Bondi Order thus purports to obligate MPD officers and staff to follow Defendant Cole's commands.

106.    Second, by conferring on Defendant Cole the right to act as Chief of Police, it attempts to remove that legal authority from the duly appointed Chief of Police, Pamela A. Smith.

107.    Third, it "hereby rescinds" and "suspends" Executive Orders and General Orders issued by the Chief of Police, which bind MPD officers in how they carry out their duties.

108.    And fourth, it orders the Mayor and MPD to enforce various District laws and regulations against the general public.

109.    The Bondi Order easily clears the bar for final agency action.

110.    By taking these actions, the Agency Defendants have violated the APA in at least three respects.

111.    First, the Agency Defendants may not lawfully assume direct operational control of MPD, appoint persons to positions within the MPD chain of command, or exercise any powers

of those offices. The Home Rule Act and District of Columbia law vest ultimate, exclusive control of MPD in the Mayor.

112.    Second, the Agency Defendants may not lawfully direct MPD policies or request services other than for a stated "federal purpose." Purely local law enforcement anywhere in the District is not a "federal purpose" for which Defendants can request MPD's services under the Home Rule Act or otherwise. And nothing in the Home Rule Act confers the right on Agency Defendants to change MPD's internal policies and procedures. On the contrary, Congress made clear in the Home Rule Act that it sought to give the residents of the District control over all matters of local concern, including local law enforcement and the operation of its police department.

113.    Finally, the Agency Defendants may not lawfully take actions pursuant to the EO because the invocation of Section 740 is invalid. The order lists generalized concerns about crime in the District but does not identify the type of "special conditions of an emergency nature" with adequate specificity to know when the special emergency conditions have ended, as the Home Rule Act requires.

114.    The District is therefore entitled to a stay and vacatur of the Bondi Order, a preliminary and permanent injunction enjoining implementation of the Bondi Order and the issuance of any future order or directive that purports to exert federal control over MPD's operations or local law enforcement activities, and a declaratory judgment that the Agency Defendants have violated the APA by issuing the Bondi Order contrary to law and in excess of legal authority.

## COUNT TWO
### Administrative Procedure Act
### Arbitrary, Capricious, an Abuse of Discretion, and Otherwise
### Not in Accordance with the Law
### (Agency Defendants)

115.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

116.    The APA directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

117.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

118.    Agency Defendants failed to engage in reasoned decision-making as required by the APA, and failed to consider the important public safety consequences of their unprecedented action in issuing the Bondi Order.

119.    The Bondi Order does not even attempt to explain why it furthers legitimate federal purposes to oust veteran MPD leaders in favor of an installed federal official. It does not grapple with the obvious operational disruptions and threats to public safety, and it does not evaluate potential alternatives to the wholesale supplantation of MPD's leadership structure.

120.    The Bondi Order does not weigh the benefits and disadvantages of its unexplained rescission and suspension of prior MPD policies on immigration-related matters, which reflect the

considered judgment of MPD leaders who are deeply familiar with the District's law enforcement and public safety needs.

121.    Having been issued late in the evening of August 14 with immediate effect, the Bondi Order fails to explain why the abrupt toppling of MPD's structure was necessary, nor does it reflect any consideration of obvious alternatives that could reduce the chaos the order threatened.

122.    The APA requires that agency actions be both "reasonable" and "reasonably explained," *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 939 (D.C. Cir. 2017). The Bondi Order is neither.

123.    Agency Defendants further ignored the substantial burden that its sweeping changes to the MPD command structure would place on the officers and the attendant risks to public safety.

124.    Defendants' actions are arbitrary and capricious in violation of § 706(2)(A) of the APA.

125.    The District is therefore entitled to a stay and vacatur of the Bondi Order, a preliminary and permanent injunction enjoining implementation of the Bondi Order and the issuance of any future order or directive that purports to exert federal control over MPD's operations or local law enforcement activities, and a declaratory judgment that the Agency Defendants violated the APA because the Bondi Order is arbitrary, capricious, an abuse of discretion, and contrary to law.

## COUNT THREE
### *Ultra Vires* Action
### District of Columbia Self-Government and Governmental Reorganization Act
### (D.C. Home Rule Act)—Pub. L. 93-198
### (All Defendants)

126.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

127.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional or statutory authority.

128.    Defendants have exceeded the authority granted by Section 740 in at least three respects.

129.    First, Defendants have unlawfully seized operational control of MPD, including by assuming positions in the chain of command and issuing policy directives to MPD. Second, Defendants have asserted that they may direct MPD to provide services that go beyond "federal purposes." And third, the President has not identified "special conditions of an emergency nature" with adequate specificity to determine when those conditions have ended.

130.    The District is entitled to a declaration that the EO and Bondi Order are plainly unlawful and that Section 740 does not permit Defendants to implement the EO, issue the Bondi Order, assert operational control over MPD, assume positions within the chain of command supervising MPD, bypass the Mayor to direct policies and services of MPD to perform local law enforcement functions, or declare an emergency on bases so vague that it is impossible to know when it is over.

**COUNT FOUR**
**Separation of Powers, Take Care Clause, and District Clause—**
**U.S. Const. Art. I, § 1; U.S. Const. Art. II, § 3; U.S. Const. Art. I, § 8**
**(All Defendants)**

131.    The District re-alleges the foregoing paragraphs of this Complaint as if fully set forth herein.

132.    Article I, Section I of the U.S. Constitution states that "[a]ll legislative Powers herein shall be vested in a Congress."

133.    Article II, Section 3 of the United States Constitution requires that the President "shall take Care that the Laws be faithfully executed."

30

134.    Article I, Section 8, Clause 17 of the United States Constitution authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States."

135.    Congress did not grant Defendants authority to assert operational control over MPD or to assume positions in the chain of command supervising MPD. Consistent with its delegation of executive functions to local officials over local matters, Congress expressly preserved the Mayor's authority, even in the event of an emergency. Defendants' assertion of operational control over MPD through the Bondi Order directly contravenes Congress's delegation of executive functions in the District—including control over local law enforcement—to local District officials.

136.    Congress also limited the delegation of authority to the President to requests for MPD services for "federal purposes." It did not grant the President broad authority to assert control over traditionally local law enforcement functions like "maintaining law and order" throughout the District.

137.    Nor did Congress authorize the President to seize control over MPD or invoke Section 740 unless he has identified "special conditions of an emergency nature" with sufficient specificity to determine when those conditions have ended.

138.    The EO and Defendants' subsequent actions to implement the EO, including by issuing the Bondi Order, thus exceed the President's limited authority under D.C. Code § 1-207.40, in violation of the constitutional separation of powers, Take Care Clause, and the District Clause.

139.    The District is therefore entitled to a declaration that the EO and Defendants' actions to implement the EO—including the Bondi Order—violate the separation of powers, the Take Care Clause, and the District Clause by disregarding Congress's exercise of its exclusive

constitutional authority over the District to craft a narrow provision allowing the President to obtain MPD services in limited circumstances, for limited purposes, and without assuming command of MPD.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff District of Columbia respectfully requests that the Court:

a. Stay and vacate the Bondi Order as an unlawful final agency action taken by Agency Defendants;

b. Issue an order preliminarily and permanently enjoining implementation of the Bondi Order, including enjoining Defendant Cole from assuming any position of command within MPD;

c. Issue an order preliminarily and permanently enjoining Defendants from issuing any future orders or directives or taking any other action that attempts to place MPD under the control of anyone other than the Mayor and the Chief of Police, otherwise assert operational control over MPD, or otherwise attempt to direct local law enforcement activities;

d. Declare that the Agency Defendants have violated the APA by issuing the Bondi Order, because it is contrary to law, in excess of statutory authority, arbitrary, capricious, an abuse of discretion, and without observance of procedure required by law;

e. Declare that Section 740 and the EO do not permit Defendants to issue the Bondi Order, assert operational control over MPD, assume positions within the chain of command supervising MPD, or bypass the Mayor to direct policies and services of MPD to perform local law enforcement functions;

f. Declare that the EO and Defendants' actions to implement the EO—including the Bondi Order—violate the separation of powers, the Take Care Clause, and the District Clause by disregarding Congress's exercise of its exclusive constitutional authority over the District

to craft a narrow provision allowing the President to obtain MPD services in limited circumstances, for limited purposes, and without assuming command of MPD;

g.  Declare that the EO and any actions taken to implement the EO, including issuance of the Bondi Order, are contrary to the Home Rule Act and the Constitution because the EO does not identify "special conditions of an emergency nature" with sufficient specificity to determine when those conditions have ended; and

h.  Award such additional relief as the interests of justice may require.

Dated: August 15, 2025                Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (D.C. Bar No. 1026153)
MITCHELL P. REICH (D.C. Bar No. 1044671)
ELIZA H. SIMON (D.C. Bar No. 90035651)
Senior Counsels to the Attorney General

COTY MONTAG (D.C. Bar No. 498357)
Deputy Attorney General
Public Advocacy Division

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

*/s/ Alicia M. Lendon*
ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

*/s/ Nicole S. Hill*
NICOLE S. HILL (D.C. Bar No. 888324938)
PAMELA DISNEY (D.C. Bar No. 1601225)
GRIFFIN SIMPSON (D.C. Bar No. 1753943)
ANDREW MENDRALA (D.C. Bar No. 1009841)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 727-4171
Nicole.Hill@dc.gov

*Attorneys for the District of Columbia*