## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DISTRICT OF COLUMBIA**,
    400 6th Street NW
    Washington, DC 20001,

       *Plaintiff*,

    v.

**DONALD J. TRUMP**, *in his official capacity as
President of the United States*;
    1600 Pennsylvania Avenue NW
    Washington, DC 20500

**PAMELA J. BONDI**, *in her official capacity as
United States Attorney General*;
    950 Pennsylvania Avenue NW
    Washington, DC 20530

**UNITED STATES DEPARTMENT OF JUSTICE**;
    950 Pennsylvania Avenue NW
    Washington, DC 20530

**TERRANCE C. COLE**, *in his official capacity as
Administrator of the United States Drug Enforcement
Administration*;
    8701 Morrissette Drive
    Springfield, VA 22152

**UNITED STATES DRUG ENFORCEMENT
ADMINISTRATION**;
    8701 Morrissette Drive
    Springfield, VA 22152

**GADYACES S. SERRALTA**, *in his official capacity
as Director of the United States Marshals Service*;
    1215 South Clark Street
    Arlington, VA 22202

**UNITED STATES MARSHALS SERVICE**;
    1215 South Clark Street
    Arlington, VA 22202

       *Defendants*.

Case No.: 1:25-cv-2678

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR A TEMPORARY RESTRAINING ORDER AND 5 U.S.C. § 705 STAY**

## PRELIMINARY STATEMENT

More than fifty years ago, following a decades-long civil-rights struggle, the District of Columbia achieved self-governance. Congress granted the District the right to pass its own laws and safeguard its own residents. Key to this self-governance system was the Mayor's right to oversee public safety—and, in particular, her right to supervise the Metropolitan Police Department ("MPD") and, with the consent of the Council of the District of Columbia, to appoint the Chief of Police. Last night, Attorney General Pamela Bondi ripped that key component of local autonomy from the District's grasp. For the first time in a half-century of local self-governance, and with no valid statutory basis, she purported to appoint an Emergency Police Commissioner, to hobble the Chief of Police, to override several MPD General Orders, and to direct MPD officers how to carry out their duties to enforce local laws. That action has sown chaos since its issuance, poses a severe threat to public safety, and intrudes on the sovereignty that Congress conferred on the District through the Home Rule Act. The Court should swiftly reject this baseless power grab and restore order to the District and its law enforcement officers.

*      *      *

Invoking its Constitutional authority "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the] District," U.S. Const. Art. I, § 8, cl. 17, Congress in 1973 enacted the District of Columbia Home Rule Act—a foundational charter that "grant[s] to the inhabitants of the District of Columbia" many of the "powers of local self-government" that other Americans enjoy: to elect a Mayor and a City Council, to adopt local laws, and to operate the institutions of local government largely as they see fit. Pub. L. No. 93-198, § 201 (1973). Congress reserved for itself the authority to review the District's laws and legislate on matters of federal concern. But it otherwise left the operation of the local government in local hands.

By contrast, Congress gave the President an exceedingly narrow role in the governance of the District. In Section 740 of the Home Rule Act, Congress provided that when the President "determines that special conditions of an emergency nature exist," the President may require that the Mayor "provide[] such services" of the MPD as the President deems necessary for "federal purposes." D.C. Code § 1-207.40(a). That authority is sharply limited in time: It must terminate within 48 hours unless the President sends notice to Congress and, in all events, it must terminate within 30 days. *Id.* § 1-207.40(a)-(b). Moreover, by its terms, this provision only permits the President to require the Mayor to provide "services" of MPD for "federal purposes" in "special circumstances of an emergency nature"—not to seize control of MPD to police local crime however the President thinks best. In the 52 years since the enactment of Home Rule, no President has ever previously exercised this authority.

Nonetheless, on August 11, the President announced that he was "placing the Police Department under direct federal control" and installing the Administrator of the Drug Enforcement Administration as the "interim commissioner" of MPD. He then issued an Executive Order invoking his power under Section 740. *See* "Declaring a Crime Emergency in the District of Columbia," Exec. Order No. 14333 (Aug. 11, 2025).

At 7:29 p.m. on August 14, Attorney General Bondi issued an order attempting to exercise full control over MPD. The order, entitled "Restoring Safety and Security to the District of Columbia," purports to immediately install Defendant Cole as MPD's "Emergency Police Commissioner" and to vest him with "all of the powers and duties vested in the District of Columbia Chief of Police." Order No. 6370-2025, 1-2 ("Bondi Order"), Ex. A. The order further requires "the current Chief of Police" and all other senior leadership at MPD to "receive approval from Commissioner Cole before issuing any further directives to the MPD." *Id.* at 2. The order

4

goes on to "hereby" rescind or suspend provisions of three MPD orders issued by the Chief of Police that address MPD officers' involvement in immigration enforcement. *Id*. It also directs MPD to enforce, "to the maximum extent permissible by law," certain municipal laws and regulations pertaining to unlawful occupancy of public spaces. *Id*. And finally, it generally "rescind[s]" any existing MPD directives that conflict with any of its provisions. *Id*.

Defendant Bondi's order is patently unlawful. First, Defendant Bondi has unlawfully attempted to assume complete operational control of MPD, install her own appointee as "Emergency Police Commissioner," issue commands directly to MPD, and oversee the Department's local matters—even though the Home Rule Act limits her to requesting that "the Mayor" provide MPD services "for federal purposes." Second, the Bondi Order is arbitrary and capricious because, among other reasons, it fails to explain why a dramatic takeover of the MPD is warranted or consider the costs of overthrowing the structure of the District's police force with no notice or coordination. Third, the Order is *ultra vires* action because it is plainly in excess of Defendants' statutory authority. Fourth, because Defendants have usurped the authority granted exclusively to Congress and seized power without any statutory basis, the Bondi Order is unconstitutional.

In light of these numerous clear legal defects, the District is extremely likely to prevail on the merits. And the other requirements for a temporary restraining order are clearly satisfied as well. Each day—and hour—that the President's unlawful takeover of MPD continues, the District suffers irreparable harm in the form of operational chaos for its police department, the diversion of police resources away from other priorities, and an unlawful intrusion on its powers of self-government. The order threatens to upend the command structure of MPD, endangering the safety of the public and law enforcement officers alike. Indeed, in Chief Pamela Smith's nearly three

decades in law enforcement, she has "never seen a single government action that would cause a greater threat to law and order than this dangerous directive." Declaration of Pamela Smith ("Smith Decl.") ¶ 16, Ex. B. And the public interest and the equities favor a restoration of the system of home rule that Congress designed, rather than a continuation of the lawless takeover that Defendants have attempted.

## BACKGROUND

I.    **The Home Rule Act Grants the District Autonomy Over Its Own Affairs, Including Control of MPD.**

The Constitution grants to Congress the power "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the District of Columbia]." U.S. Const. Art. I, § 8, cl. 17. Congress's implementation of that authority has evolved. For much of the 1800s, Congress approved and provided for a locally elected council. Chris Myers Asch & George Derek Musgrove, *Chocolate City: A History of Race and Democracy in the Nation's Capital* 36-37 (2017); *see* Act of 1812 Amending the Charter of Washington, ch. 75, 2 Stat. 721 (May 4, 1812). Beginning in 1871, however, the District was governed, at first in part and then in total, by presidentially appointed officials. This left the District's residents with no say in local policies or governance. *See* An Act to provide a Government for the District of Columbia, ch. 62, 16 Stat. 419 (Feb. 21, 1871); Asch & Musgrove 160, 165; Temporary Organic Act of 1874, ch. 337, 18 Stat. 116 (June 20, 1874).

Throughout the 20th century, politicians and policymakers increasingly recognized that District residents were being deprived of basic civil rights. In the 1960s, President Johnson advocated for District voting rights as a part of his broader civil rights agenda. Harry S. Jaffe & Tom Sherwood, *Dream City: Race, Power, and the Decline of Washington, D.C.* 44 (1994). Home rule, according to President Johnson, was "the truest course," and the District's citizens have "the right to frame their own laws, manage their own affairs, and choose their own leaders." Special

Message to the Congress Transmitting Reorganization Plan 3 of 1967: Government of the District of Columbia (June 1, 1967).[1]

Building on this movement, Congress enacted the Home Rule Act in 1973. *See* District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93-198, 87 Stat. 774 (Dec. 24, 1973) (codified at D.C. Code §§ 1-201.01 to 1-207.71). Through the Home Rule Act, Congress "grant[ed] to the inhabitants of the District of Columbia powers of local self-government," D.C. Code § 1-201.02(a), and sought, "to the greatest extent possible, consistent with the constitutional mandate," to "relieve [itself] of the burden of legislating upon essentially local District matters." *Id.* To this end, the Home Rule Act created an elected legislative body, the Council of the District of Columbia, and granted it "legislative powers," subject to limited restrictions. *Id.* § 1-206.02(a). The Home Rule Act also "vested" the "executive power of the District" in an elected Mayor, who serves as the "chief executive officer of the District government." *Id.* § 1-204.22.

The Act makes the Mayor responsible for, among other things, overseeing the District's local police force, MPD. *Id.* § 1-204.22(4); *see id.* § 5-105.01(a). Under District law, the Mayor appoints the Chief of Police, who in turn supervises MPD officers. *See id.* §§ 5-105.01(a-1) and 5-127.03. The Chief is "subject to any orders, rules, and regulations as may from time to time be issued by the Mayor or Council of the District of Columbia," and is "responsible for the proper and efficient conduct, control, and discipline of the force." 6-A DCMR § 800.1. Individual officers, in turn, must obey lawful orders they receive from superior officers and must abide by MPD rules and policies. *See* D.C. Code § 5-127.03; 6-A DCMR §§ 200.5, 200.22.

---

[1] https://www.presidency.ucsb.edu/documents/special-message-the-congress-transmitting-reorganization-plan-3-1967-government-the.

Under the Home Rule Act, Congress "retain[s]" "ultimate legislative authority" over the District, including the right to review legislation enacted by the Council. D.C. Code § 1-201.02(a); *see also id.* §§ 1-206.01 to 1-206.04. But unless Congress intervenes, the Act provides that control over local matters remains in the hands of local elected leaders.

## II.    Section 740 of the Home Rule Act Grants the President a Time-Limited Authority to Require MPD Assistance in Emergency Circumstances for Federal Purposes.

In contrast to the system of presidential control that preceded Home Rule—and which Congress sought to abolish—the Home Rule Act grants the President virtually no role in the governance of the District of Columbia. One exceedingly narrow exception is Section 740 of the Home Rule Act, which grants the President a time-limited authority to require assistance from MPD in certain emergency circumstances. It states:

> Notwithstanding any other provision of law, whenever the President of the United States determines that special conditions of an emergency nature exist which require the use of the Metropolitan Police force for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate.

D.C. Code § 1-207.40(a).

By its text, this provision may be invoked only in extraordinary circumstances: where "the President of the United States determines that special conditions of an emergency nature exist." *Id.* And it grants the President a narrowly circumscribed authority once he makes the requisite determination. He may only "direct the Mayor to provide him . . . services of the Metropolitan Police force," not command the police force himself. *Id.* Further, he may request such services only "for federal purposes," not for local matters that the Home Rule Act expressly reserves to the people of the District and their locally elected officials. *Id.*

The authority granted by Section 740 is also time-limited. Services provided under Section 740 cannot be required for more than 48 hours unless the President has, within that timeframe, "notified the Chairmen and ranking minority members of the Committees on the District of Columbia of the Senate and House of Representatives, in writing," about the reason for the services requested and "the period of time during which the need for such services is likely to continue." *Id*. Moreover, the services provided under Section 740 must terminate after 30 days, when the emergency ends, or when Congress enacts a joint resolution providing for termination—whichever occurs first. *Id*. § 1-207.40(b)-(c). In all events, "no such services made available pursuant to the direction of the President pursuant to [Section 740] shall extend for any period in excess of 30 days," unless Congress enacts a joint resolution approving of such an extension. *Id.* § 1-207.40(d).

During consideration of the Home Rule Act, Congress specifically rejected a proposal to place the Police Department under presidential control by giving the President authority to appoint the Chief of Police. *See* Nelson Amendment, *reprinted in* Home Rule for the District of Columbia 1973-1974: Background and Legislative History ("Home Rule"), at 2406 (1974); *see id.* (statement of Rep. Nelson) (explaining that, under this amendment "we would have a line of authority coming down from the President to the law enforcement facility of the District of Columbia"). Opponents of this measure objected on the ground that local police should be "responsive to the interests of those in the community," *id.* at 2408 (statement of Rep. Adams), and that vesting control in the President "strikes very deeply at the entire heart of the subject of home rule" by conveying that Congress "does not feel that the people of the District of Columbia are fit to govern themselves," *id.* at 2409 (statement of Rep. McKinney). At the same time, Members noted that the federal government could ensure the protection of "basic Federal functions" and "[t]he Federal interest"

both by deploying federal law enforcement and by invoking Section 740. *Id.* at 2408 (statement of Rep. Adams).

In the 52 years since the enactment of Home Rule, no President has ever previously exercised his authority under Section 740.

### III.    President Trump Invokes Section 740 of the Home Rule Act with the Intention of Taking Over the District's Local Police Force.

The President has long expressed an interest in taking over the District's local affairs and has repeatedly stated his plan to do so: "We're also going to federalize Washington D.C.," he said in January 2024. "It's become hell on earth. . . . . [Y]ou can't even walk through the best areas without being molested or shot, beat up by thugs. We're going to take over Washington D.C., and we're going to make it great again."[2] On August 11, flanked by Defendant Bondi, Defense Secretary Pete Hegseth, FBI Director Kash Patel, U.S. Attorney for the District of Columbia Jeanine Pirro, and other officials, the President made good on these threats.

#### A.  The Press Conference

In a press conference in the White House briefing room, President Trump "announc[ed] a historic action to rescue our nation's capital from crime, bloodshed, bedlam, and squalor, and worse." He continued, "[t]his is liberation day in DC and we're gonna take our capital back. We're taking it back." In addition to deploying the D.C. National Guard and threatening an influx of additional military personnel, the President asserted that one of the measures he was taking to achieve these objectives was invoking Section 740. Pursuant to that assertion of authority, he said he was "placing the Metropolitan Police Department under direct federal control."[3]

---

[2] https://rollcall.com/factbase/trump/transcript/donald-trump-speech-campaign-rally-mason-city-iowa-january-5-2024/.

[3] https://rollcall.com/factbase/trump/transcript/donald-trump-press-conference-law-enforcement-washington-dc-august-11-2025/.

The President also announced that "Attorney General Pam Bondi […] is taking command of the Metropolitan Police Department as of this moment" and that Defendant Cole would be "designated as the interim federal commissioner" of MPD. Later, in her own remarks, Defendant Bondi announced that Defendant Cole "is going to be supervising the Metro Police Department."[4]

At the August 11 press conference, the President claimed that the District "has been overtaken by violent gangs and bloodthirsty criminals, roving mobs of wild youth, drugged out maniacs and homeless people," and asserted that, "[w]e're not gonna let it happen anymore. We're not gonna take it."[5] During the almost two-hour press conference, President Trump repeated a number of his well-worn and hyperbolic complaints against the District.

### B. The Executive Order

On the same day as the press conference, the President issued an Executive Order ("EO") that invoked his authority under Section 740 of the Home Rule Act. *See* "Declaring a Crime Emergency in the District of Columbia," Exec. Order No. 14,333 (Aug. 11, 2025) ("EO"). The President did not identify any new or unusual exigency to justify the invocation of Section 740. Instead, he simply declared that violence in the District is "rising" and that the District is "bedlam."

The EO repeats some of the same claims about rising crime in the District and effectuates the President's assertion of authority under Section 740. Section One, captioned "Crime is out of control in the District of Columbia," asserts that that there is a problem of "rising violence" and "increasing violent crime" in the capital. EO § 1. The sole data the order cites for those assertions are statistics from 2024, none of which reflect the decreases in violent crime the District has seen over the past year—decreases that the Administration has acknowledged elsewhere.

---

[4]*Id.*
[5]*Id.*

Section Two of the EO, entitled "Services of the Metropolitan Police Department of the District of Columbia," states that the President has "determined that special conditions of an emergency nature exist that require the use of the Metropolitan Police Department of the District of Columbia (Metropolitan Police force) for Federal purposes." EO §2. The EO includes a list of purported "federal purposes," one of which is "maintaining law and order in the Nation's seat of Government." *Id.* It further states that, "[e]ffective immediately, the Mayor of the District of Columbia (Mayor) shall provide the services of the Metropolitan Police force for Federal purposes for the maximum period permitted under section 740 of the Home Rule Act." *Id.*

Section Three, "Operational Control of the Metropolitan Police Department of the District of Columbia," delegates "[t]he authority of the President conferred by section 740(a) of the Home Rule Act" to the Attorney General. EO § 3. The EO does not identify the need for discrete services from the MPD; instead, it directs the Mayor to "provide such services of the Metropolitan Police force as the Attorney General may deem necessary and appropriate." *Id.*

Section Four, "Monitoring and Recommendations," requires the Attorney General to monitor conditions in the District and advise the President on whether further actions are necessary. EO § 4.

On August 11, the President sent letters to the Chair and Ranking Member of the House Committee on Oversight and Government Accountability and the Senate Committee on Homeland Security and Governmental Affairs notifying them that he had invoked Section 740 and stating that "the Mayor will provide to me the services of [MPD] for Federal purposes until I have determined, in consultation with the Attorney General, that the emergency has ended or for the maximum period permitted under section 740."[6]

---

[6] https://www.nytimes.com/interactive/2025/08/11/us/trump-letter-dc-police-letter.html.

**IV.     While Local Officials Initially Remained in Control of the MPD After the Section 740 Invocation, the Defendants Are Now Executing Their Plan to Take Over MPD**

> **A.  Defendants' assertions of unlawful control over MPD initially conflicted with the Mayor and Police Chief's experience on the ground.**

In the hours following the release of the Executive Order, the White House released multiple public statements reiterating the President's belief that he had completely taken over control of MPD. For instance, at an August 12, 2025, White House press briefing, a reporter, noting the Mayor and Police Chief's statements that they remained in control of MPD, asked Press Secretary Karoline Leavitt who was in charge of MPD at the moment. Leavitt responded, "[i]f you read the Executive Order, it will tell you . . . but ultimately, the chain of command is as such: the President of the United States, the Attorney General of the United States, our DEA Administrator, Terry Cole, who is now serving ahead of the chief of [MPD]." When a reporter started to challenge Leavitt's statement, she reiterated: "Nope, Terry Cole, as you heard from this briefing room yesterday, is in charge of the Metropolitan Police Department."

The President has also since made clear his intentions to retain control over MPD indefinitely. When asked in a press briefing whether he would be seeking congressional support for a resolution extending the Section 740 invocation beyond its 30-day limit, he stated, "[w]ell if it's a national emergency, we can do it without Congress. But we expect to be before Congress, very quickly . . . . We're going to be asking for extensions on that—long term extensions—because you can't have 30-days. . . . We're going to want extensions. I don't want to have to call a national emergency, but if I have to, I will."[7]

Despite Defendants' unlawful assertions of control over MPD, the Mayor and Chief of Police initially remained in operational control of MPD, as required by the Home Rule Act.

---

[7] https://www.youtube.com/watch?v=QGEgh6ZbWUM&ab_channel=13WMAZ.

Following the President's August 11 press conference and issuance of the EO, Mayor Bowser held a press conference of her own, where she explained that, under the Home Rule Act, she remained in command of the MPD, together with the Chief of Police. The Mayor further noted that there are limits to the ways in which the President can request MPD services under the Home Rule Act. But she reasserted her commitment—and that of the District—to continue to coordinate with federal law enforcement agencies to address public safety concerns and further reduce crime in the District.[8]

On August 12, 2025, District officials met with Defendant Bondi, Defendant Cole, and other federal officials to discuss the EO. Following the meeting, Defendant Bondi posted on social media that she had a "productive meeting" with the Mayor and that, "[a]t President Trump's direction, [DOJ] will work closely with D.C. city government and [MPD] to make Washington, D.C. safe again." Mayor Bowser and Chief Smith reiterated their message from the day before, stating that it was a cooperative meeting and that MPD's "organizational chart, how [it does] business and fund[s] the police and make[s] changes, none of that has changed." And when directly asked, Chief Smith correctly stated that she reports to Mayor Bowser.[9]

### B. Defendants are now exerting control over the whole of MPD.

Defendants have now formally asserted complete control over MPD. On the evening of August 14, 2025, Defendant Bondi issued Order No. 6370-2025, "Restoring Safety and Security to the District of Columbia" ("Bondi Order"). The Bondi Order purports to "order the Mayor of the District of Columbia and the [MPD] to immediately implement" multiple directives. Bondi Order at 1. Defendant Bondi ordered that, "effective immediately," Defendant Cole "shall serve as

---

[8] https://www.youtube.com/watch?v=71ES6EBMfNA&ab_channel=DCMayor%27sOffice.
[9] https://www.youtube.com/watch?v=UPM8QoXclUQ&ab_channel=WUSA9.

MPD's Emergency Police Commissioner for the duration of the emergency declared by the President." *Id.* at 1-2. She further ordered that "Commissioner Cole shall assume all of the powers and duties vested in the District of Columbia Chief of Police." *Id.* at 2. And she stated that "the current Chief of Police" and all other senior leadership at MPD "must receive approval from Commissioner Cole before issuing any further directives to the MPD." *Id.* The Bondi Order further purports to rescind or suspend provisions of three MPD orders issued by the Chief of Police that address MPD officers' involvement in immigration enforcement. *Id.* It also directs MPD to enforce, "to the maximum extent permissible by law," certain municipal laws and regulations pertaining to unlawful occupancy of public spaces. *Id.* Finally, the Bondi Order generally "rescind[s]" any existing MPD directives that conflict with any of its provisions. *Id.*

## STANDARD

A temporary restraining order is warranted when the movant demonstrates: "(1) a substantial likelihood of success on the merits; (2) that the moving party would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    The District Is Likely to Succeed on the Merits.

The District is likely to succeed in showing that the Bondi Order is unlawful in several respects. First, the Order is contrary to law under the Administrative Procedure Act (APA). It exceeds the narrow grant of authority in Section 740—which limits the President or his delegee to

directing "the Mayor" to provide services "for federal purposes"—by asserting direct operational control of MPD as to all matters, federal and local. Second, it is arbitrary and capricious, in violation of the APA, because it fails to consider the obvious disruption of suddenly upending the structure of the District's police department. Third, it is ultra vires because it plainly exceeds the limits of the President's statutory authority. And, fourth, it is unconstitutional because it violates the limits that Congress, in its exercise of exclusive authority over the District, imposed on the President in the Home Rule Act.

### A.  The Bondi Order Is Contrary to Law.

Section 740 provides that "whenever the President determines that special conditions of an emergency nature exist that require the use of the Metropolitan Police force for federal purposes, he may direct the Mayor to provide him, and the Mayor shall provide, such services of the Metropolitan Police force as the President may deem necessary and appropriate." D.C. Code §1-207.40(a). The Bondi Order violates the plain text of this provision in at least four ways: (1) It purports to issue commands directly to MPD, rather than to "the Mayor"; (2) it installs a handpicked federal official to oversee the MPD without the Mayor's supervision or direction; (3) it orders policy changes that do not constitute requests for the provision of "services"; and (4) it asserts control over local MPD operations that lack any nexus to a "federal purpose."

*First*, the Bondi Order violates Section 740 by issuing each of its commands to MPD directly. *See* Bondi Order at 1 ("I hereby order . . . the Metropolitan Police Department . . . "). Section 740 permits the President or his delegee to "direct *the Mayor*," and provides that "*the Mayor* shall provide[] [the] services of the Metropolitan Police force" in response. D.C. Code § 1-207.40(a) (emphasis added). Had it wished, Congress could easily have drafted the provision to provide that the President or his delegee could order MPD directly. But by twice confirming

that the Mayor stands between the President and MPD, Congress made clear that it intended that she would remain in command of the Department throughout the period in which Section 740 is activated.

The structure and context of the Home Rule Act reinforce this straightforward reading. Section 422 of the Home Rule Act vests the Mayor with ultimate operational control of MPD. It provides that "[t]he Mayor shall, through the heads of administrative boards, offices, and agencies, supervise and direct the activities of such boards, activities, and agencies," including MPD. D.C. Code § 1-204.22(4). And it makes the Mayor "the chief executive officer of the District government," deeming her "responsible for the proper execution of all laws relating to the District"—including, of course, through its police force. *Id.* § 1-204.22; *see Miner v. District of Columbia*, 87 F. Supp. 3d 260, 267 (D.D.C. 2015) ("In the District of Columbia, the Mayor is ultimately responsible for the police department."). Congress said nothing in Section 740 to displace this express grant of authority to the Mayor. And Section 740 should not lightly be read to override an express provision of the same Act. *See Roberts v. Sea-Land Servs.*, 566 U.S. 93, 100 (2012) (a court's "task is to fit, if possible, all parts" of a statute "into an harmonious whole").

Furthermore, when Congress wished to empower the President to control the institutions of District government directly, it did so expressly. For instance, it authorized the President to "take such action . . . with respect to the administration of the functions of the District government, as he deem[ed] necessary to enable" the Board of Elections to assist the transition to home rule. D.C. Code § 1-207.21. Similarly, it preserved his role as Commander-in-Chief of the D.C. National Guard. *See id.* §§ 49-409, 1-206.02(b). Congress conspicuously did not include a similar grant of authority in Section 740, and the court should not read one in, contrary to the provision's plain

text. *See Tanzin v. Tanvir*, 592 U.S. 43, 51 (2020) (declining to read a statute to preclude damage remedies under RFRA because "[h]ad Congress wished to . . . it knew how to do so").[10]

*Second*, the Bondi Order violates Section 740 by purporting to install Defendant Cole as Emergency Police Commissioner and giving him authority to supervise and direct all MPD operations. *See* Bondi Order at 1. Again, Section 740 provides only that the President (or his delegee) may "direct the Mayor to provide . . . services." D.C. Code § 1-207.40(a). By appointing Defendant Cole to run MPD, the Bondi Order directly contravenes this command twice over. It puts in place a federally appointed officer who can issue directives to MPD *without* going through the Mayor—effecting a clear evasion of Congress's decision that the Mayor must be the person to both receive "direct[ives]" and "provide" services. *Id.* And the appointment itself cannot plausibly be construed as directing the Mayor to "provide . . . services." *Id.*

Reading Section 740 as a grant of appointment power in the President would also be inconsistent with the broader structure and history of the Home Rule Act. The Home Rule Act vests the Mayor with the "executive power" of the District, which includes the appointment power. D.C. Code § 1-204.22. And District law specifically vests the Mayor with appointment authority over MPD leadership. *Id.* § 5-105.01(a) ("The Mayor . . . shall appoint to office, assign to such duty or duties as he may prescribe, and appoint all officers and members of said Metropolitan Police force."); *id.* § 5-105.01(a-1)(1) ("The Mayor shall appoint the Chief of Police, with the advice and consent of the Council . . . ."). This was a highly deliberate decision. Prior to Home

---

[10] The fact that section 740 is labeled "Emergency Control of Police" does not alter this conclusion. The text of section 740 makes clear that the only "control" Congress granted the President was the authority to direct the Mayor to provide the services of MPD for federal purposes. Further, while section headings can sometimes be instructive, *see Dubin v. United States*, 599 U.S. 110, 120–21 (2023), they cannot override the plain meaning of the statute's text. *See iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 65 (D.C. Cir. 2021); *Vertex Pharms. Inc. v. U.S. Dep't of Health & Hum. Servs.*, 774 F. Supp. 3d 211, 229 (D.D.C. 2025).

Rule, the chief of police was selected by a presidentially appointed commissioner. During debates over the Home Rule Act, the House considered an amendment to the Act that would have preserved the President's authority to appoint the police chief. But Members of Congress decisively rejected that amendment, concluding that it "str[uck] very deeply at the entire heart of the subject of home rule." Home Rule at 2409 (statement of Rep. McKinney). Reading Section 740 to grant the President the very appointment authority that Congress rejected would flout this considered decision. And that is particularly so given that Congress elsewhere made clear the few instances in which it wished to give the President authority to appoint District officials. *See* D.C. Code §§ 1-204.33(a) (allowing the nomination of judges), 1-204.34(b)(4)(A) (permitting the appointment of one member of the Judicial Nomination Commission).

*Third*, the Bondi order is unlawful because it orders actions—including the rescission of MPD policies and the establishment of enforcement priorities, *see* Bondi Order at 2—that do not constitute requests to "provide . . . services." Section 740 limits the President and his delegees to requesting that the Mayor "provide . . . services of the Metropolitan Police force." At the time of the enactment of the Home Rule Act, as now, the term "service" meant "help" or "benefit." *See Webster's First Collegiate Dictionary* 1059 (8th ed. 1973). By using this term, Congress therefore permitted the President to ask the Mayor to grant or issue some form of discrete "help" or "benefit" from MPD—for instance, by asking that MPD provide security for a federal event or protect a particularly sensitive location in emergent circumstances. It did not permit the President to ask the Mayor to take actions that do not plausibly entail the provision of services by MPD. Asking the Mayor to issue or repeal general MPD policies, or to order MPD *not* to act, cannot conceivably be viewed as "provid[ing] . . . services of the Metropolitan Police force." D.C. Code § 1-207.40(a).

Again, the remainder of the Home Rule Act is instructive. Multiple other provisions of the Home Rule Act require entities to provide "services" upon request, in language that parallels Section 740. Section 431, for instance, provides that the District Government "shall furnish to the [Commission on Judicial Disabilities and Tenure], upon the request of the Tenure Commission, such records, information, services, and such other assistance as may be necessary to enable the Tenure Commission properly to perform its functions." *Id.* § 1-204.31(d)(4). Similarly, Section 434 provides that the District "shall furnish to the [Judicial Nomination] Commission, upon the request of the Commission, such records, information, services, and such other assistance facilities as may be necessary to enable the Commission properly to perform its function." *Id.* § 1-204.34(c)(3). It is unlikely in the extreme that these provisions, by allowing the Tenure Commission and the Judicial Nomination Commission to obtain services, authorize those commissions to demand that the District Government set general policies or refrain from acting; rather, they contemplate the provision of some affirmative aid or support. It follows that Congress meant the same thing when it used a similar phrasing in Section 740. *See Pereira v. Sessions*, 585 U.S. 198, 211 (2018) ("[I]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.") (internal citation omitted).

*Fourth*, the Bondi Order is unlawful because it purports to grant Defendant Cole authority over all aspects of MPD operations, even purely local matters that lack any nexus to a "federal purpose." *See* Bondi Order at 1-2. Section 740 authorizes the President to require the services of MPD for "federal purposes." D.C. Code § 1-207.40(a). By its plain text, the term "federal purposes" refers to the objectives and interests of the federal government—matters such as protecting federal personnel and property or enabling the operation of federal agencies. By contrast, "federal purposes" do not include objectives that are characteristically local, such as

engaging in ordinary criminal law enforcement and apprehending individuals who violate local criminal laws. *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 859 (2014) (distinguishing "traditionally local criminal conduct" from "matter[s] for federal enforcement" (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971)). Congress made clear that it did not intend to authorize the President to request MPD services for local purposes when it specified that the services must be for "federal purposes." D.C. Code § 1207.40(a). Otherwise, the phrase would be superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).

The broader context of the Home Rule Act reinforces this distinction between federal and local matters. *See Abramski v. United States*, 573 U.S. 169, 179 (2014) ("[W]e must . . . interpret the relevant words not in a vacuum, but with reference to the statutory context . . . ." (cleaned up)). The core purpose of the Home Rule Act was to give "the inhabitants of the District Columbia powers of local self-government" and to relieve Congress, "to the greatest extent possible . . . of the burden of legislating upon essentially local matters." D.C. Code § 1-201.02(a). The Act thus entrusted the District with control over nearly all local functions. *See, e.g.*, *id.* § 1-203.02 (providing that "the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States" and the Home Rule Act); *id.* § 1-204.22 (providing that the Mayor "shall be responsible for the proper execution of all laws relating to the District, and for the proper administration of the affairs of the District coming under his jurisdiction or control"). In contrast, it reserves to Congress authority over uniquely federal matters, such as legislation "concern[ing] the functions or property of the United States or which is not restricted in its application exclusively in or to the District." *Id.*

§ 1206.02(a)(3). Read in light of this fundamental division of authority, Section 740 is naturally interpreted to preserve the same distinction: It gives the President a narrow, emergency power to require services of the police force for "federal purposes," but it otherwise leaves in place the Mayor's authority to direct the police as to all local matters.

Defendants' complete assumption of control over MPD is irreconcilable with Congress's decision to limit the President's authority under Section 740 to "federal purposes." As noted above, Defendants have claimed that they now stand in the chain of command supervising MPD, and that Defendant Cole is its "Emergency Police Commissioner." Bondi Order at 1. To effectuate this assertion of total control of MPD, the Bondi Order states that "Commissioner Cole shall assume all powers and duties vested in the District of Columbia Chief of Police" and "shall have the authority to issue *any* general orders, executive orders, or other written directions that apply to Members of MPD." *Id.* (emphasis added). It does not stop there. The provision goes on to add that "[e]xisting MPD leadership . . . must receive approval from Commissioner Cole before issuing *any* further directives to the MPD." *Id.* (emphasis added).

As noted above, this provision is unlawful because Section 740 gives the President and his delegees no authority to appoint officers who issue orders directly to MPD, bypassing the Mayor. *See supra* pp. 16-20. But it is separately unlawful because it grants Cole control of MPD that extends far beyond the achievement of any valid "federal purposes." By purporting to vest Cole with the authority to set priorities, direct law enforcement operations, and make staffing and hiring decisions, the Bondi Order encompasses numerous functions that MPD carries out that are necessarily local in nature. These include policing local crime, performing community engagement activities, coordinating with local health and human services agencies to increase access to social services, and responding to demonstrations. In seizing control of these functions and overseeing

how they will be carried out, Defendants necessarily go beyond directing "the use of the Metropolitan Police force for Federal purposes," EO § 4, and intrude into local matters that Congress vested exclusively in the Mayor.

**B. The Bondi Order Is Arbitrary And Capricious.**

The Bondi Order is also arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Most critically, it reflects a "[s]udden and unexplained change" that failed to "take account of legitimate reliance" interests, *Smiley v. Citibank*, 517 U.S. 735, 742 (1996), or "consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Attorney General issued her order late in the evening of August 14, effective immediately, with no prior notice to MPD. Smith Decl. ¶ 10. The order does not explain why that abrupt toppling of MPD's structure was necessary, nor does it reflect any consideration of obvious alternatives that could have reduced the chaos and disruption that the order threatened. The Attorney General could, for example, have provided a reasonable amount of notice before the order went into effect, but the order reflects no consideration of such a possibility (or any other means of reducing disruption to MPD and the District residents it serves). *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 30-33 (2020) (invalidating agency action for failure to consider reliance interests and potential means of addressing them).

The Bondi Order is also arbitrary and capricious because it is neither "reasonable" nor "reasonably explained," *Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 937 (D.C. Cir. 2017); *see also State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise"). The Bondi Order does

not even attempt to explain how seizing control of the entirety of MPD and upending its command structure suddenly and without notice furthers legitimate federal purposes—and it is by no means a reasonable decision. The order also failed to grapple with the obvious operational disruptions and serious threats to public safety that would flow from its sudden disruption to MPD's command structure and its hampering of MPD leadership's ability to issue directives to MPD's over 3,100 law enforcement officers. *See* Smith Decl. ¶¶ 16-24. It reflects no consideration of potential alternatives to the wholesale and sudden supplantation of MPD's leadership structure. The order also does not weigh the costs and benefits of its unexplained rescission and suspension of prior MPD policies on immigration-related matters, which reflect the considered judgment of MPD leaders who are deeply familiar with the District's law enforcement and public safety needs. And it does not weigh the costs and benefits of directing MPD to enforce, "to the maximum extent permissible," municipal laws and regulations pertaining to unlawful occupancy of public spaces, Bondi Order at 2, including the costs of diverting law enforcement resources away from other higher priority issues, such as preventing and responding to crimes of violence, weapons offenses, and narcotics operations, Smith Decl. ¶ 25; *see FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (requiring that an agency "display awareness that it *is* changing position," "show that there are good reasons for the new policy," and address prior factual findings).

### C.  The Bondi Order Is Ultra Vires.

In addition to flunking APA review, the Bondi Order must be temporarily enjoined for another, independent reason: it is plainly ultra vires. "Review for *ultra vires* acts rests on the longstanding principle that" government action ""unauthorized by the statute under which [the agency or official] assumes to act . . . 'violate[s] the law' and 'the courts generally have jurisdiction to grant relief.'" *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir.

2022) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)); *see also Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2326021, at *12 (D.C. Cir. Aug. 13, 2025); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Such relief is available in cases of "'extreme'" error where the government "has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court[.]'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022) (quoting *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)) (brackets in original).

For the same reasons that the federal government's usurpation of MPD is contrary to Section 740, it is also "plainly beyond the bounds of" the statute. *Fed. Express Corp.*, 39 F.4th at 764 (quoting *Griffith*, 842 F.2d at 493); *see also Changji Esquel Textile Co. Ltd. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022) (ultra vires review available where "plainly" unauthorized action is contrary to "clear and mandatory" statutory directive (internal quotation marks omitted)). For example, Section 740 in no uncertain terms provides that the President or his delegee may "direct *the Mayor*," and that "*the Mayor* shall provide . . . services of the Metropolitan Police force." D.C. Code. § 1-207.40(a) (emphases added). But the Bondi Order installs a new "Emergency Police Commissioner" who may bypass the Mayor and issue orders directly to MPD officers. Bondi Order at 1-2. Further, the Bondi Order rescinds existing MPD orders, sets new priorities, and directs MPD officers to disregard contrary directives—all without the Mayor's participation. *Id.* at 2. And although Section 740 only permits "the use of the Metropolitan Police force for federal purposes," D.C. Code. § 1-207.40(a), the order affirmatively supplants the current Chief and chain of command in all matters, including purely local law enforcement matters, including by directing

that all "[e]xisting MPD leadership, including the current Chief of Police, . . . must receive approval from Commissioner Cole" before acting. Bondi Order at 2.

Thus, the federal government has "stepped . . . plainly beyond the bounds of" Section 740 and acted in "clear[] . . . defiance of it." *Fed. Express Corp.*, 39 F.4th at 764 (internal quotation marks omitted). Section 740 in no way authorizes the order's extreme and total assertion of control over MPD in all matters, and "the President [and subordinate agencies] may not decline to follow . . . [that] mandate . . . simply because of policy objections." *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013). The District is therefore likely to succeed on the merits of its ultra vires claim.

### C.  The Bondi Order Is Unconstitutional.

The Bondi Order also contravenes several provisions of the U.S. Constitution, including the District Clause, federal separation of powers, and the Take Care Clause—furnishing yet another independent basis meriting immediate relief. The Supreme Court has long recognized the right of parties to seek to enjoin government officials from violating the Constitution. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (collecting cases); *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers . . . reflects a long history of judicial review of illegal executive action.").

Here, the Constitution prohibits the President and Agency Defendants' conduct in at least three ways. Begin with the District Clause. That Clause authorizes Congress to "exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may . . . . become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17. That Clause gives *Congress*—not the Executive—"the entire control over the [D]istrict for every

purpose of government." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 619 (1838); *see Palmore v. United States*, 411 U.S. 389, 408 (1973) (acknowledging the Constitution's "plenary grant[ ] of power to Congress to legislate with respect to" the District). The President has no independent authority to make policy for the District but instead must follow Congress's express directives and exercise only the power delegated to him.

Further, Article I of the Constitution allows Congress—and only Congress—to make law. U.S. Const. art. I, § 1 ("All legislative Powers herein shall be vested in a Congress."). That core responsibility of Congress is part of the separation-of-powers doctrine that is both "foundational" and "evident from the Constitution's vesting of certain powers in certain bodies." *Seila L. LLC v. CFPB*, 591 U.S. 197, 227 (2020). In contrast to Congress's law-making power, it is well-settled that the Executive's powers are limited to those specifically conferred by "an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Under "the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Id.* at 587.

Indeed, once Congress enacts legislation, the Executive has an affirmative constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see also Morrison v. Olson*, 487 U.S. 654, 690 (1988) (explaining that the President has a "constitutionally appointed duty to 'take care that the laws be faithfully executed.'" (quoting U.S. Const. art. II, § 3)). The Supreme Court has explained that "[u]nder our system of government, Congress makes laws and the President . . . faithfully execute[s] them." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 327 (2014) (cleaned up). The Executive does not wield "authority to set aside congressional legislation by executive order." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir.

1999). The Executive violates the Take Care Clause when it overrides statutes enacted by Congress.

Here, the defendants have violated all three constitutional limits—the District Clause, separation of powers, and the Take Care Clause—for similar reasons. As explained above, *supra* pp. 6-10, Congress used its legislative authority under the District Clause to grant Home Rule to the District, authority over MPD to the Mayor, and limited emergency powers to the President under Section 740. By exceeding the careful bounds codified in each piece of legislation and claiming novel powers for the federal executive, the President and Agency Defendants have usurped Congress's authority for themselves and violated their duties under the Take Care Clause.

To be sure, "every action by the President, or by another executive official, in excess of his statutory authority is" not "*ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). When the Executive exceeds mundane procedural limits in a statute, for example, complaints about those excesses may not be of constitutional significance. *See id.* However, many of the powers asserted by the Executive here—namely, the powers to assume operational control of a municipal department, create new roles within that department, promulgate and rescind binding policies for that department, and direct the department how to enforce local laws—are so extreme and unmoored from the relevant statutes as to be not "even contemplated by Congress." *Chamber of Com. of the U.S.*, 74 F.3d at 1332; *see Global Health Council*, 2025 WL 2326021, at *8 (acknowledging the distinction between contravening a statute and acting wholly without statutory basis). Rather, those powers appear to be invented from whole cloth. And claims involving the "*absence* of *any* statutory authority" are reviewable for injunctive relief directly under the Constitution. *Dalton*, 511 U.S. at 473.

## II.     The District Will Suffer Imminent, Irreparable Harm as a Result of the Bondi Order.

The District will suffer devastating and irreparable harms in the absence of an injunction—indeed, it already is. *See Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 20 (2008). At this moment, the Bondi Order purports to oust the Mayor and Chief of Police from control of MPD and to prevent MPD leadership from issuing any directives unless they first seek approval from a newly appointed federal official who has no knowledge of the department's operations, policies, or procedures. This assertion of authority—made without any advance warning or notice—has sown confusion and will continue to wreak operational havoc if the Bondi Order is not promptly enjoined. The takeover also disrupts the Mayor's ability to fulfill her duty to control and oversee the MPD, a key part of the right to self-govern that Congress gave the District through the Home Rule Act. And, ultimately, the chaos created by the sudden and unlawful takeover of a local police force jeopardizes the safety of its officers and the community they serve. Simply put, in her "nearly three decades in law enforcement," Chief Smith has "never seen a single government action that would cause a greater threat to law and order than this dangerous directive." Smith Decl. ¶ 16.

The disruption to MPD's chain of command caused by the federal government's takeover irreparably harms the District. MPD already has an experienced command structure that is deeply familiar with MPD's general orders and lawful procedures. *Id.* ¶ 18-19. MPD deploys more than 3,100 officers across seven police districts. *Id.* ¶ 19. These officers understand the District's unique law enforcement needs and how best to track and respond to crime in these communities. *Id.* Under MPD's lawful command structure, MPD is able to make dozens of arrests of adults and juveniles every day in fast-moving and dangerous operations across the city and can process these arrests according to well-established procedures. *Id.* ¶ 18. The order injects dangerous uncertainty in the command structure about who is lawfully in charge. *Id.* ¶ 20 ("There is no greater risk to public

safety in a paramilitary organization than to not know who is in command."). And allowing federal officials who are unfamiliar with these procedures to take the helm of MPD will inevitably disrupt these operations, leaving both MPD personnel and District residents at risk of grave harm. *See, e.g.*, *id.* ¶ 23 ("The confusion and delays caused by this upending of the command structure will endanger public safety, placing the lives of MPD officers and District residents at grave risk."); *id.* ¶ 22 ("Requiring literally every directive to receive approval from Commissioner Cole prior to issuance as required by the Bondi Order would effectively freeze public safety operations in the District of Columbia.").

Moreover, the federal takeover of MPD is happening at the same time as the deployment across the District of hundreds of federal law enforcement agents, and the anticipated deployment of National Guard personnel, all of whom are unfamiliar with MPD procedures. *Id.* ¶ 24. Disrupting the MPD chain of command—especially during the midst of a "surge" in federal law enforcement—threatens to undermine MPD's lawful processes and threatens the safety of our law enforcement personnel and the community they serve. *Id.* A temporary reversion to the status quo ante is urgently needed to prevent harms that cannot be undone.

The District is also harmed by the unlawful intrusion on its authority over its local police force.  The Home Rule Act vests the Mayor with the ultimate authority to oversee MPD, and the District is harmed when that authority is wrested from its elected leader and unlawfully placed in the hands of unauthorized Presidential designees. This loss of local autonomy that Congress provided to the District is itself an irreparable injury. *See W. Virginia by & through Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1136 (11th Cir. 2023) ("This injury to state sovereignty is, to be sure, intangible. But it is nonetheless concrete. . . . Moreover, this injury has already occurred and is continuing."); *Texas v. Yellen*, 105 F.4th 755, 774 (5th Cir. 2024) ("The States'

injuries are irreparable because [the challenged federal statute] impacts their sovereign authority over tax policy.").

### III.    The Public Interest and Balance of Equities Tip Sharply in Favor of a TRO.

A temporary restraining order is appropriate where: (1) the balance of equities tips in favor of the applicants; and (2) an injunction is in the public interest. *Winter*, 555. U.S. at 20. Those two "factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Here, the balance of equities and public interest tip sharply in the District's favor.

As an initial matter, the District has established an extremely highly likelihood of prevailing on the merits of its challenge to the Bondi Order and faces grave, irreparable harm to its residents in the absence of an immediate injunction. The District's "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

Also "[o]n the District's side of the balance is the governmental interest in enforcing its duly enacted law, and the likelihood of 'concrete harm to [the District's] law enforcement and public safety interests.'" *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). First, the District has a strong public interest in preserving the autonomy and self-government that Congress gave District residents in the Home Rule Act.  *See Hand v. Scott*, 888 F.3d 1206, 1215 (11th Cir. 2018) (finding the state has a "substantial public interest" in "preserving autonomy" of a state

board's "exercise of its power."); *W. Virginia by & through Morrisey*, 59 F.4th at 1149 (finding that the public interest is served by "preserv[ing] state sovereignty" and not "vest[ing] power in one central government"); *Times Mirror Co. v. United States*, 873 F.2d 1210, 1213 (9th Cir. 1989) (noting the "public's interest in self-governance and prevention of abuse of official power").

Second, the District has a specific interest in preserving its oversight of law enforcement. In the Home Rule Act, Congress granted the District the authority to control its police department and provide for the safety of its citizens, *see supra* pp. 6-8, 16-23. *See League of Women Voters of United States*, 838 F.3d at 12 ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *Banks v. Booth,* 468 F. Supp. 3d 101, 124 (D.D.C. 2020) (noting that there is a "public interest in permitting the government discretion to carry out its authorized functions"). Defendants' unlawful takeover harms the public interest by suspending the District's right to control its local police and its authority to provide for the safety of its citizens. *See, e.g.*, Smith Decl. ¶ 16 ("If effectuated, the Bondi Order would upend the command structure of MPD, endangering the safety of the public and law enforcement officers alike."). The public interest is served if the Court enjoins Defendants from taking unlawful control of the District's local police and allows the MPD to fulfill its duty to enforce local laws.

Third, the District has a strong interest in maintaining public safety, and the safety concerns that result from taking away the District's authority over local police are already apparent. As outlined above, the Bondi Order wreaks havoc on the command structure and organization of the MPD. *See, e.g.*, *id.* ¶¶ 21-23. It also sows confusion during a surge in federal law enforcement. *Id.* ¶ 24.

A temporary restraining order will not harm Defendants. The federal government "cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Moreover, the federal government's unlawful takeover was novel and incredibly disruptive of the status quo that has existed in the District for over 50 years. A mere temporary pause to restore the status quo is no great infringement on the federal government's interests. And regardless of what happens in the courthouse, the dedicated public servants in the MPD will continue to protect the public, safeguard the community, and work in close cooperation with their federal partners to ensure the safety of District residents. An injunction would not impede the federal government from using the lawful tools at its disposal to address its concerns about crime in the District. It would not affect the federal government's ability to surge federal law enforcement, deploy the National Guard, or continue its law enforcement's longstanding cooperative efforts with MPD. It would simply restore to the people of the District the right of local control over their police force that Congress secured to them in the Home Rule Act.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and a stay of the Bondi Order under 5 U.S.C. § 705 should be granted.

Dated: August 15, 2025                Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

EMMA SIMSON (D.C. Bar No. 1026153)
ELIZA H. SIMON (D.C. Bar No. 90035651)
Senior Counsels to the Attorney General

*/s/ Mitchell P. Reich*
MITCHELL P. REICH (D.C. Bar No. 1044671)
Senior Counsel to the Attorney General

COTY MONTAG (D.C. Bar No. 498357)
Deputy Attorney General
Public Advocacy Division

BENJAMIN MOSKOWITZ (D.C. Bar No. 1049084)
Assistant Deputy Attorney General
Legal Counsel Division

ALICIA M. LENDON (D.C. Bar No. 1765057)
Chief, Civil Rights and Elder Justice Section
Public Advocacy Division

NICOLE S. HILL (D.C. Bar No. 888324938)
PAMELA DISNEY (D.C. Bar No. 1601225)
GRIFFIN SIMPSON (D.C. Bar No. 1753943)
ANDREW MENDRALA (D.C. Bar No. 1009841)
Assistant Attorneys General
Office of the Attorney General for
the District of Columbia
400 6th Street NW
Washington, DC 20001
Tel: (202) 279-1261
mitchell.reich@dc.gov

*Attorneys for the District of Columbia*