# Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DISTRICT OF COLUMBIA<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *et al.*<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: Civil Action No.:<br>:<br>:<br>:<br>:<br>: |

## DECLARATION OF PAMELA A. SMITH

I, Pamela A. Smith, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Chief of Police of the D.C. Metropolitan Police Department ("MPD"). I have served in this role since my unanimous confirmation by the Council of the District of Columbia on November 7, 2023.

2. MPD's mission is to safeguard the District of Columbia and protect its residents and visitors with the highest regard for the sanctity of human life.

3. As Chief, I am the chief executive officer of MPD. Subject to District law, regulations, and orders or directives by the Mayor, I have full power and authority over the MPD and all functions, resources, officials, and personnel assigned thereto. I am also responsible for the proper and efficient conduct, control, and discipline of the force. 6-A DMCR § 800.1 *et seq*.

4. I have compiled the information in this declaration based on personal knowledge, through agency personnel who have assisted me in gathering information from our agency, and on the basis of documents I have reviewed.

5. As the local law enforcement agency in the Nation's Capital, MPD has always cooperated extensively with federal partners. For instance, MPD participates alongside federal law enforcement in the Safe Streets Task Force, Money Laundering Task Force, Carjacking Task Force, Regional Fugitive Task Force, Joint Terrorism Task Force, the Firearms Trafficking Team, and High Intensity Drug Trafficking Area Team.

6. Since the Presidential Inauguration in January 2025, MPD has worked closely with officials from the White House and federal agencies to address concerns regarding crime in the District. For example, MPD participates in the D.C. Safe and Beautiful Task Force that was created as part of Executive Order 14252, "Making the District of Columbia Safe and Beautiful."

7. Despite this close coordination, MPD was unaware of President Trump's plans to assume control of the local police force until he announced it at a press conference at the White House on August 11, 2025. At that time, he declared a federal takeover of MPD pursuant to Section 740 of the District of Columbia Home Rule Act, D.C. Code § 1-207.40. During the press conference, the White House released an Executive Order entitled "Declaring a Crime Emergency in the District of Columbia" (the "Executive Order") in which the President stated he was assuming "Operational Control" of MPD under Section 740. Executive Order 14333, § 3.

8. At the August 11 press conference, the President announced that United States Attorney General Pamela Bondi would be "taking command" of MPD, and that the Administrator of the U.S. Drug Enforcement Administration ("DEA"), Terrence Cole, would be "in charge of the Metropolitan Police Department." President Trump also referred to DEA Administrator Cole as the "interim commissioner" of MPD.

9. To my knowledge, the federal government made no request to the Mayor for services or support from MPD in advance of the press conference and release of the Executive Order.

10. On August 14, 2025, without any advance notice to MPD, Attorney General Bondi issued Order 6370-2025, "Restoring Safety and Security to the District of Columbia" ("Bondi Order"). The Bondi Order, "[e]ffective immediately," purports to name Administrator Cole as MPD's "Emergency Police Commissioner." Bondi Order ¶ 1. The Bondi Order also claims to grant Administrator Cole "all of the powers and duties vested in the District of Columbia Chief of Police" and grants him "authority to issue any general orders, executive orders, or other written directives that apply to Members of the MPD." *Id.*

11. The Bondi Order further attempts to direct MPD leadership, including myself, to "receive approval from Commissioner Cole before issuing any further directives to MPD." *Id.*

12. In addition, the Bondi Order claims to rescind Executive Order EO-25-005, which I issued on August 14, 2025. Bondi Order ¶ 2. The purpose of that Executive Order was to amend MPD procedures regarding cooperation with federal immigration enforcement agencies.

13. The Bondi Order also purports to suspend part of General Order GO-PER-201.26 ("Code of Conduct Order") *Id.* ¶ 3. This General Order, issued on June 12, 2024, establishes the responsibilities and standards of conduct for all sworn and civilian members of MPD. The Bondi Order claims to rescind Section IV, paragraph 22 of the Code of Conduct Order, which pertains to immigration enforcement.

14. The Bondi Order further claims to suspend part of General Order GO-PCA-702.01 ("Arrest Warrants Order"). Bondi Order ¶ 4. This Order, which was issued on October 18, 2023, establishes arrest warrant procedures. The Bondi Order claims to rescind Section II, paragraphs A.2 and F, which also relate to immigration enforcement. In addition, Section II,

paragraph A.2 effectuates a longstanding Mayoral directive, Mayor's Order 2011-174. This Order was issued on October 19, 2011, and it establishes District-wide policy and procedures related to immigration enforcement activities. By attempting to rescind Section II, paragraph A.2 of the Arrest Warrants Order, I understand the Bondi Order to also attempt to rescind Mayor's Order 2011-174.

15. The Bondi Order also claims to direct MPD to enforce, to the maximum extent permissible by law, D.C. Code § 22-1307 and all District of Columbia municipal regulations pertaining to the unlawful occupancy of public spaces. Bondi Order ¶ 5. D.C. Code § 22-1307, entitled "Crowding, obstructing, or incommoding," makes it unlawful to crowd, obstruct, or incommode certain spaces, such as streets, avenues, or the passage through a park. D.C. Code § 22-1307(a)(1)(A)-(D). It also prohibits demonstrations under certain circumstances. *Id.* at (b)(1).

16. If effectuated, the Bondi Order would upend the command structure of MPD, endangering the safety of the public and law enforcement officers alike. In my nearly three decades in law enforcement, I have never seen a single government action that would cause a greater threat to law and order than this dangerous directive.

17. The Bondi Order claims to direct all MPD leadership to receive approval first from Administrator Cole before issuing directives to other MPD personnel. It seeks to strip away and reassign my authority as Chief of Police, which, under District law and by delegation from the Mayor, includes exclusive command and control of MPD personnel and operations, including the authority to issue directives. 6-A DCMR § 800.3. As Chief, I also have authority to plan and prescribe departmental policy, and to coordinate, direct, and control all

MPD programs, services, and operations. 6-A DCMR § 800.16. The Bondi Order attempts to usurp all of these functions.

18. MPD already has an experienced command structure that is deeply familiar with MPD's general orders and lawful procedures. Under this command structure, MPD is able to make dozens of arrests in fast-moving and dangerous operations across the city and can process these arrests according to well-established procedures.

19. MPD deploys more than 3,100 officers across seven police districts. These officers are deeply familiar with their district's unique law enforcement needs and how best to track and respond to crime in these communities. They rely on the expertise and quick decision-making of their superior officers and the leadership of MPD to carry out operations in a safe and effective manner.

20. Imposing a new command structure "effective immediately" will wreak operational havoc within MPD and create tremendous risk for the public. The new command structure will create confusion for MPD personnel, who are required under District law to respect and obey the Chief of Police as the head and chief of the police force. D.C. Code § 5-127.03. There is no greater risk to public safety in a paramilitary organization than to not know who is in command.

21. The new command structure imposed by the Bondi Order will also inevitably lead to delays and confusion as MPD personnel—including its experienced leadership—are forced to run their directives by an "Emergency Commissioner" who is unfamiliar with MPD procedures and unfamiliar with the communities in which we police.

22. The Bondi Order provides "[e]xisting MPD leadership … must receive approval from Commissioner Cole before issuing any further directives to the MPD." In MPD's paramilitary structure, supervisors starting at the rank of sergeant, continuing through the ranks of lieutenant, captain, inspector,

commander, assistant chief, and executive assistant chief, issue directives to members under their command at all times, from routine paperwork and personnel assignments to responding to domestic violence calls to crowd management to the execution of high-risk warrants. Requiring literally every directive to receive approval from Administrator Cole prior to issuance as required by the Bondi Order would effectively freeze public safety operations in the District of Columbia.

23. The confusion and delays caused by this upending of the command structure will endanger public safety, placing the lives of MPD officers and District residents at grave risk.

24. Moreover, the federal takeover of MPD is happening at the same time as the deployment across the District of hundreds of federal law enforcement agents and hundreds of National Guard personnel, all of whom are unfamiliar with MPD procedures. Disrupting the MPD chain of command—especially during the midst of a "surge" in federal law enforcement—threatens to undermine MPD's lawful processes and threatens the safety of our law enforcement personnel and District residents.

25. The Bondi Order's directive to enforce, to the maximum extent permissible by law, D.C. Code § 22-1307 and all District of Columbia municipal regulations pertaining to the unlawful occupancy of public spaces would also require me to divert law enforcement resources away from other priorities, such as preventing and responding to crimes of violence, weapons offenses, narcotics operations, and burglary prevention and response. In my judgment, this diversion of resources will undermine public safety in the District.

26. Several demonstrations involving potentially thousands of demonstrators are scheduled to occur in the District of Columbia over the weekend of August 15 – 17, including a religious demonstration across from the Indian embassy, a bike ride in support of Palestinians, and a planned protest against the President by a group who has previously blocked intersections. In preparation for anticipated First Amendment activities on Friday alone, the Department has

activated civil disturbance units from all seven districts. The Bondi Order will immediately hamper MPD's command and control efforts and thereby its ability to effectively ensure public safety surrounding these events.

27. Finally, the Bondi Order also purports to rescind any existing MPD directives to the extent they conflict with any provisions in the Bondi Order. But the Bondi Order does not specify which MPD directives would be rescinded. MPD personnel therefore run the risk of complying with existing MPD directives while unknowingly defying the Bondi Order, leaving them potentially subject to disciplinary actions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of August 2025, in Washington, D.C.

_____
Pamela A. Smith
Chief of Police
Metropolitan Police Department of the
District of Columbia